246 N.J. Super. 414 (1991)
587 A.2d 1299
IN THE MATTER OF THE GUARDIANSHIP OF S.C.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1991.
Decided March 12, 1991.
*415 Before Judges MICHELS, GRUCCIO and D'ANNUNZIO.
David J. Popiel argued the cause for appellant L.C. (Community Health Law Project, attorney; David J. Popiel, of counsel and on the brief).
Lauren Fleischer Carlton, Deputy Attorney General, argued the cause for respondent Division of Youth and Family Services (Robert Del Tufo, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Lauren Fleischer Carlton, on the brief).
Kenneth R. Meyer, Law Guardian, argued the cause for the minor S.C. (Porzio, Bromberg & Newman, attorney; Kenneth R. Meyer, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Appellant L.C., the natural mother of S.C., appeals from (1) a judgment of the Chancery Division, Family Part that (a) terminated her parental rights, and those of A.V., with respect to the minor child, S.C.; (b) placed S.C. in the guardianship and control of respondent New Jersey Division of Youth and Family Services *416 (Division) for all purposes, including placement for adoption; (c) denied her motions for birthday visitation and for unsupervised contact with S.C., and (d) directed the immediate cessation of visitation between her, A.V. and S.C., except for one last visit at the Division's office, and (2) from a postjudgment order that denied her motion to compel the Division to pay her experts' fees.
L.C. seeks a reversal of the judgment and order on the following grounds set forth in her brief:
I. L.C.'S PARENTAL RIGHTS MAY NOT BE TERMINATED ON THE BASIS OF N.J.S.A. 30:4C-15 SINCE L.C. HAS DILIGENTLY MAINTAINED CONTACT WITH HER DAUGHTER AND PLANNED FOR HER FUTURE.
II. S.'S BEST INTERESTS DO NOT REQUIRE TERMINATION OF PARENTAL RIGHTS. L.C. SHOULD RETAIN HER PARENTAL RIGHTS AND ASSUME SUPERVISED CUSTODY OF S. HOWEVER, L.C.'S RETENTION OF PARENTAL RIGHTS DOES NOT NECESSARILY REQUIRE THAT SHE ASSUME CUSTODY OF S.L.C. MAY RETAIN HER PARENTAL RIGHTS AND S. MAY YET REMAIN IN THE FOSTER FATHER'S PHYSICAL CUSTODY, WITH L.C. AFFORDED VISITATION RIGHTS.
A. THE PROOFS ARE INSUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT PARENTAL RIGHTS SHOULD BE TERMINATED OR THAT L.C. SHOULD LOSE CUSTODY OF HER DAUGHTER. AT THE LEAST, A REMAND IS REQUIRED FOR FURTHER REVIEW.
A1. APPELLANTS HABITS ARE NOT SUCH AS TO INFLICT UPON HER DAUGHTER THE KIND OF SERIOUS HARM CONTEMPLATED BY A.W. NOR HAS THE STATE PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT SHE CANNOT CARE FOR HER DAUGHTER'S MEDICAL NEEDS OR THAT S. WILL SUFFER SERIOUS EMOTIONAL HARM IF REMOVED FROM THE FOSTER HOME.
A2. APPELLANT IS WILLING TO COMPLY WITH REASONABLE SUPERVISORY SERVICES NECESSARY TO ELIMINATE POTENTIAL HARM TO S.
B. L.C. MAY RETAIN PARENTAL RIGHTS EVEN IF SHE IS NOT AWARDED CUSTODY OF S., SO LONG AS HER VISITS POSE NO THREAT OF HARM TO THE CHILD. S. MAY REMAIN IN THE FOSTER FATHER'S PHYSICAL CUSTODY PURSUANT TO AN ORDER THAT ESTABLISHES A LONG-TERM FOSTER CARE RELATIONSHIP, GRANTS THE FOSTER FATHER CUSTODY, OR VESTS HIM WITH GUARDIANSHIP POWERS. L.C. MAY THEN CONTINUE TO VISIT S.
B1. PARENTAL RIGHTS ARE DIVISIBLE INTO DEGREES OF CUSTODY AND VISITATION AND CANNOT BE TERMINATED WHILE A PARENT *417 REMAINS CAPABLE OF EXERCISING ANY SUBSTANTIAL OR MEANINGFUL COMPONENT OF THESE RIGHTS. THUS, INABILITY TO ASSUME CUSTODY OF A CHILD DOES NOT TERMINATE A PARENT'S RIGHT TO VISITATION SO LONG AS VISITATION IS NOT HARMFUL TO THE CHILD. THIS IS THE TRADITIONAL VIEW THAT FAMILY LAW, EVER RELUCTANT TO TERMINATE THE RIGHTS OF EVEN HIGHLY DISRUPTIVE PARENTS, TAKES OF PARENTAL RIGHTS. IT IS THE VIEW OF PARENTAL RIGHTS THAT THE LEGISLATURE HAD IN MIND WHEN IT ENACTED THE STATUTORY SCHEME FOR TERMINATION OF PARENTAL RIGHTS.
B2. L.C.'S VISITS WITH S. POSE NO THREAT OF HARM TO THE CHILD. THEREFORE, HER PARENTAL RIGHTS SHOULD NOT BE TERMINATED AND SHE SHOULD BE PERMITTED TO CONTINUE VISITING HER DAUGHTER.
B3. L.C. BEING PERFECTLY CAPABLE OF CONTINUING TO VISIT HER DAUGHTER WITHOUT HARMING HER, THE CRITERIA OF A.W. HAVE NOT BEEN MET, AND PARENTAL RIGHTS CANNOT BE TERMINATED.
1. THE PARENTAL RELATIONSHIP DOES NOT SERIOUSLY IMPAIR S.'S HEALTH OR DEVELOPMENT.
2. SINCE VISITATION IS NOT HARMFUL TO S., THUS, THERE IS NO HARM FOR L.C. TO ELIMINATE. FURTHERMORE, NO DELAY OF PERMANENT PLACEMENT IS NECESSARY.
3. PERMANENT PLACEMENT WITH THE FOSTER FATHER AND VISITATION RIGHTS FOR L.C. IS THE APPROPRIATE ALTERNATIVE TO TERMINATION OF PARENTAL RIGHTS.
4. TERMINATING L.C.'S PARENTAL RIGHTS WILL DO MORE HARM THAN GOOD BECAUSE IT WILL SEVER S.'S RELATIONSHIP WITH THE ONLY MOTHER SHE HAS, AND WILL DO SO WITHOUT ANY COMPENSATING GAIN FOR THE CHILD.
B4. THE FOSTER FATHER MAY RETAIN CUSTODY OF S. PURSUANT TO AN ORDER THAT ESTABLISHES A LONG-TERM FOSTER CARE RELATIONSHIP, GRANTS HIM CUSTODY, OR VESTS HIM WITH GUARDIANSHIP POWERS.
C. THE DECISION BELOW TO TERMINATE ALL OF APPELLANT'S PARENTAL RIGHTS, EVEN HER LIMITED RIGHT TO VISIT HER CHILD, CONSTITUTES A DENIAL TO HER OF A FUNDAMENTAL RIGHT UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE FEDERAL CONSTITUTION AND UNDER ARTICLE I, PARAGRAPH 1 OF OUR STATE CONSTITUTION.
D. THE DECISION BELOW TO TERMINATE ALL OF APPELLANT'S RIGHTS, EVEN HER RIGHT OF VISITATION, CONSTITUTES A DENIAL TO HER OF THE EQUAL PROTECTION OF THE LAWS UNDER THE FEDERAL AND STATE CONSTITUTIONS.
III. IF L.C.'S PARENTAL RIGHTS ARE TERMINATED, SHE SHOULD STILL BE ALLOWED TO VISIT HER DAUGHTER. THERE IS NO *418 LEGAL BAR TO VISITATION, AND A RANGE OF ALTERNATIVE PLACEMENTS (LONG-TERM FOSTER CARE, OR GRANTING CUSTODY, GUARDIANSHIP, OR ADOPTION TO THE FOSTER FATHER) CAN AFFORD S. THE PERMANENCE SHE NEEDS WHILE PERMITTING L.C. TO VISIT.
A. N.J.S.A. 30:4C:22, WHICH ADDRESS DYFS' GUARDIANSHIP AUTHORITY, DOES NOT AFFORD DYFS SOLE JURISDICTION OVER THE PLACEMENT OF CHILDREN FOLLOWING TERMINATION OF PARENTAL RIGHTS. TO THE CONTRARY, THE STATUTORY SCHEME FOR ASSURING THE WELL-BEING OF CHILDREN ENVISIONS CONTINUED JUDICIAL OVERSIGHT OF PLACEMENTS TO THE TIME OF ADOPTION AND PERMITS THE COURT TO ORDER VISITATION WITH A NATURAL PARENT EVEN AFTER TERMINATION OF PARENTAL RIGHTS AND TO CONDITION POST-TERMINATION PLACEMENTS, INCLUDING ADOPTION, UPON SUCH VISITATION.
B. LONG-TERM FOSTER CARE, OR THE GRANTING OF CUSTODY, GUARDIANSHIP OR ADOPTION TO THE FOSTER FATHER ARE ALL LEGALLY PERMISSIBLE OPTIONS. EACH OF THEM WOULD AFFORD S. WHATEVER PERMANENCE SHE REQUIRES WHILE PERMITTING APPELLANT TO VISIT.
IV. DEFENDANT, FACING LOSS OF HER CHILD, COULD NOT PREPARE A PROPER DEFENSE WITHOUT EXPERT ASSISTANCE IN MEETING THE COMPLEX PSYCHOLOGICAL AND MEDICAL TESTIMONY INTRODUCED AGAINST HER. THUS, RETENTION OF EXPERTS AT STATE EXPENSE IS REASONABLY NECESSARY, OTHERWISE INDIGENT DEFENDANTS WILL FUNCTION AT A MARKED DISADVANTAGE TO BOTH FINANCIALLY WELL-OFF DEFENDANTS AND THE STATE.

I.
We are satisfied from our study of the record and the arguments presented that substantial credible evidence in the record as a whole reasonably warrants the trial court's findings and conclusions that termination of L.C.'s and A.V.'s parental rights is in the best interest of S.C., that S.C. be committed to the Division's guardianship, care, custody and control and that visitation is inappropriate based upon the harm that has occurred or would befall S.C. by continued contact with L.C. or A.V. We discern no sound reason or justification for disturbing these findings and conclusions. Leimgruber v. Claridge Assocs., Ltd., 73 N.J. 450, 455-56, 375 A.2d 652 (1977); Rova Farms Resorts, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, *419 483-84, 323 A.2d 495 (1974); State v. Johnson, 42 N.J. 146, 163-64, 199 A.2d 809 (1964). See also R. 2:11-3(e)(1)(A). Moreover, all of the issues of law raised are clearly without merit. See R. 2:11-3(e)(1)(E).
The termination of L.C.'s and A.V.'s parental rights with respect to S.C. complied with the four prong test set forth by our Supreme Court in New Jersey Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-10, 512 A.2d 438 (1986). First, the evidence proved clearly and convincingly that the parental relationships seriously impaired S.C.'s health and development. The proofs show that L.C. is unable to meet S.C.'s medical needs. Therefore, placing S.C. in L.C.'s custody would place S.C.'s life and health at serious risk. Moreover, S.C. has a strong and powerful psychological bond with her foster family and destroying that bond would psychologically scar S.C.
The uncontroverted proofs show that S.C. suffers from severe asthma, a life-threatening condition that requires constant and careful monitoring to ensure her survival. Dr. Aguila, Director of Pediatric Pulmonology at the Newark Children's Hospital, labeled S.C.'s asthma condition "extreme." Dr. Fost, a pediatrician and allergist, agreed with Dr. Aguila's assessment of S.C.'s condition, testifying that:
Well, I was aware before I even spoke with Dr. Aguila that [S.C.] is a severe asthmatic who can quickly go into respiratory failure as evidenced by her one admission where she had been seen 24 to 48 hours prior to that difficult episode as an out-patient and treated and within 24, 48  48 hours developed severe respiratory distress that required a tube to be inserted down to  to support her  her ventilation. That to me signifies that she's what we call labile, can quickly go badly.

On such a child it is absolutely critical that the child be followed with the utmost care, get all the appropriate medications, and even with that she  she still is a powder keg that has to be taken care of by someone who will recognize when the  the asthma is of such a state that more is required. [Emphasis added].
S.C.'s serious asthmatic episodes resulted in her repeated hospitalizations, including hospitalization in the intensive care unit, four to five day admissions, intubation and other rescue procedures.
*420 S.C. needs vigilant care. S.C.'s complicated medical regimen is subject to change. S.C.'s current medical regimen consists of a bronchial dilator called Somophyllin four times a day, anti-nebulized inflammatory medications called Ventolin and Intal every six to eight hours, an atopical steroid called Azmacort every six hours and bursts of Prednisone depending on S.C.'s clinical condition. These medications must be given precisely because over-medication and under-medication have dire consequences. The side effects of over-medication include rapid heartbeat (palpitations), irregular heartbeat, vomiting, convulsions, shock and steroid withdrawal. Under-medication is the major cause of asthma mortality. To appropriately care for S.C.'s asthma, the caretaker must guard against the trigger factors for asthma and adapt and deal with new trigger factors and warning signs because the physician relies heavily on the information supplied by the caretaker. Dr. Aguila testified that:
[T]here are a lot of therapeutic options in the management of asthma. And it needs a good team approach between the mother or the caretaker and the doctor. We have  she must learn to characterize the child to us. She must give us a profile of the child. The reason is because our  a lot of our decisions will depend on that.
Everyone who testified in this case, except L.C. and Jean Guarnieri, the Director of Parents and Children Together, agreed that L.C. is incapable of independently caring for S.C. Dr. Dyer, a psychologist, conducted a psychological evaluation of L.C. and concluded that L.C.'s immaturity would prevent her from being an adequate parent. He explained that:
Based on my administration of these techniques, it is my opinion that [L.C.] suffers from a degree of personality immaturity that would exclude her being able to provide adequate parenting to a young child in terms of consistent atunement, consistent responsibility, consistent attentiveness to a young child's needs.
In fact, [L.C.] tends to see herself as being in the role of a dependent child in relation to other people and that this seems to be the way in which she maintains a positively valued self-image, by clinging to this safe position of being a dependent child in relation to the adults who represent parent figures.
L.C., who is at the upper level of the borderline retarded range, spent four years at Brisbane, a New Jersey residential *421 psychiatric hospital for children. Dr. Dyer noted that a Learning Disability Evaluation conducted at Brisbane indicated that L.C. had severe learning problems in the areas of auditory association, visual memory and auditory memory. In Dr. Dyer's opinion:

[T]hese [problems] were never satisfactorily addressed as far as I have been able to determine from my review of the records. That is to say that [L.C.] never had any kind of specific therapy or other treatment with a learning consultant to remediate these particular specific learning disabilities. [emphasis added].
Based on L.C.'s test results and L.C.'s records, Dr. Dyer opined that L.C. does not possess adequate parenting skills, as the following excerpts of his testimony indicate:
In my opinion [L.C.] would probably be able to perceive visual cues from the environment with a substantial degree of accuracy. But in terms of interpreting the significance of those cues as they dictate various courses of action that she lacks a substantial capacity to do this.

* * * * * * * *
It is my understanding of the tasks involved in [S.C.'s] medical care that this child is extremely fragile and requires a high degree of vigilance on the part of her caretaker to recognize the various symptoms of her disorder that could signal a life-threatening asthmatic attack. This child's situation I understand varies in terms of the care that is required, the specific procedures that are required to address different kinds of emergencies and in order to manage such a child the caretaker would have to be sensitive to these variations in her requirements to the variety of symptoms that appear and would have to have an adequate understanding of the implications of each particular constellation of symptoms in terms of the particular intervention that would be required.
In my opinion [L.C.] would not be able to accurately report her daughter's condition to a physician who has been treating her unless that physician were extremely knowledgeable about [S.C.'s] particular circumstances and was able to ask very specific questions designed to elicit particular information that was related to the presence or absence of any particular physical condition and which would dictate some particular form of intervention. [Emphasis added].
Dr. Dyer reached the opinion that L.C. possesses inadequate parenting skills in part because of:
[t]he fact that [L.C.] has a deficiency in retaining learned information would suggest that she would have a great deal of difficulty in implementing any kind of new medical procedures that she might be shown for managing [S.C.'s] care.
* * * * * * * *

*422 The inability to retain material and to rely specifically on  on rote memory which tends to be deficient would cause somebody not to be able to adjust to slight variations in procedures, and I understand that such variations are required in administering the  the medication that [S.C.] is on according to various circumstances that present themselves with her physical symptoms. [Emphasis added].
In May 1987, Ms. Haldopoulos, Chief Senior Clinician of the Family Enrichment Program, administered a psychological evaluation of L.C. The test results indicated that L.C. suffers from generalized anxiety disorder and possibly, some paranoid disorder. Ms. Haldopoulos also noted some borderline personality features such as L.C.'s inability to really develop relationships, to plan and perhaps even her housing difficulties in terms of her stability. When asked to describe her assessment of L.C.'s ability to parent, Ms. Haldopoulos testified that:
I felt that although [L.C.] had some basic parenting knowledge, she was unable to understand the complex needs of her daughter and the impact of the placement and the extended placement of her daughter. Her inability to mobilize and get her daughter back. I don't think she understood the impact of leaving her daughter in foster care. I believe that's basically it.
Like Dr. Dyer, Dr. Bruey, a psychologist, believed that L.C.'s intelligence test results showed a deficit which would make it difficult for her to care for S.C. in an unsupervised setting. Dr. Bruey testified that:
If [L.C.] has [S.C.] the minimal supervision that I would suggest would be two hours a day of direct one-to-one supervision from a  some type of staff individual that's involved. And, in addition someone that's on call 24 hours a day that either  that lives in either the apartment next door or within five minutes at the most away due to [S.C.'s] medical condition. [Emphasis added].
Ms. Havican, a registered nurse, shared Dr. Dyer's opinion of L.C.'s inability to adequately care for S.C.'s medical needs. Ms. Havican reached this assessment because of L.C.'s inability to count S.C.'s breaths, as appears from the following excerpts of her testimony:
When we got to the aero chamber and [L.C.] didn't know how to count the breaths, I was shocked. Because with asthma, breathing, that's the name of the game. Breathing, how is the child breathing, is the child wheezing, is it labored breathing, is it easy breathing. That's the basis of the whole thing. *423 That's the basis of the child's survival is being able to breath easily. And knowing how to assess the breath sounds and all of this.

* * * * * * * *
So that when that question came up, how mechanically do I count the breaths, in my mind I thought, well, how  how deep now is the lack of knowledge that I'm working with. [Emphasis added].
Not only will a parental relationship with L.C. impair S.C.'s physical well-being, but it will also cause S.C. psychological harm. According to both Dr. Dyer and Dr. Bruey, S.C. has a strong and powerful bond with her foster family. Both doctors also agreed that S.C.'s removal from the foster family would be detrimental to S.C., but they disagreed over the degree and duration of the harm. Dr. Bruey and Dr. Dyer agreed that S.C. will suffer at least short-term problems if S.C. is returned to L.C. The short-term problems include depression, crying, temper tantrums, loss of appetite and regression. If these problems are not handled quickly and sensitively, they will become chronic.
Both doctors noted that L.C. has trouble comprehending the trauma S.C. will undergo if she is removed from her foster family, and this will make it harder for L.C. to help S.C. cope with the crisis. It is also undisputed that these emotional consequences place S.C. at increased risk for exacerbation of her asthmatic condition. Dr. Dyer testified that S.C.'s personality development will be severely adversely affected if she is removed from her foster home. Dr. Dyer stated that S.C.'s removal from her foster home will injure her capacity for basic trust, optimism and self-esteem and will prevent S.C. from having the ability to form stable relationships.
Second, the proofs show that L.C. is unable or unwilling to eliminate the harm to S.C. and delaying permanent placement adds to the harm. Legislative and judicial policy dictates that the child's "best interest" be protected "so far as practicable" by providing welfare services to support and maintain the integrity of the biological family as a living unit. From July 1987 to January 1989, when S.C. was under the Division's care, *424 Ms. Hughes, a Division caseworker, expended great efforts in an attempt to reunite L.C. with S.C. Ms. Hughes signed service agreements with L.C., outlining tasks and goals, and coordinated a network of people to help L.C. achieve those goals. Ms. Hughes coordinated S.C.'s evaluation and participation in an early intervention program; she provided medical supervision and training; she helped place L.C. with the Association for the Advancement of the Mentally Handicapped (Association); she involved L.C. in a parenting program. Despite L.C.'s attempts at compliance and improvement of her skills, she did not succeed. In Dr. Dyer's opinion, although L.C. appeared to make progress in her parenting skills, L.C. failed to internalize the information taught.
The record reveals that L.C. maintains a very unstable existence. L.C. is unable to maintain steady housing or employment. Since S.C.'s birth, L.C. has lived at thirteen different locations and has held five different jobs. L.C. has been unemployed since November 1988. Dr. Dyer testified that:
[S]hould [S.C.] be given to [L.C.] as caretaker it's highly probable that the same pattern of rootlessness would continue and that this child would not have the benefit of a stable residence or of a caretaker who had a stable working routine.
Q. Do you have an opinion on how that instability would impact upon [S.C.] if she were returned to L.C.?
A. Yes. That would have extremely adverse consequences in terms of this child's normal growth and development.
Dr. Dyer believed that L.C.'s constant changes in residence and employment would impair S.C.'s health and development because the instability and chaos would not facilitate S.C.'s recovery from the broken psychological bond with her foster family.
L.C.'s further unwillingness or inability to eliminate the harm to S.C. is manifested by her leaving the Association to live with T.F., her boyfriend. In leaving the Association, L.C. cut herself off from a rent-free apartment, assistance in locating employment, free medical care, paid food, electric and heating bills, and a clothing and telephone allowance. L.C. quit her last two jobs and has been unemployed since November 1988. Thus, at *425 the time of trial, L.C. was dependent upon T.F. Although T.F. is married, L.C. planned for S.C. to live with her and T.F. in a one-bedroom apartment, and she planned for T.F. to provide for her and S.C. Despite this dependence on T.F. for support, L.C. did not know T.F.'s income or financial condition. Further, L.C. testified that she would give up T.F. to get S.C. back. This unstable environment is not conducive to the healing process that S.C. must undergo if the bond with her foster family is broken.
In addition to L.C.'s inability to eliminate the harm to S.C., delaying S.C.'s permanent placement adds to that harm. Dr. Dyer testified that S.C.'s indeterminate status of foster child would have an increasingly detrimental impact on S.C. Furthermore, S.C. needs some permanence in her life now. S.C. has been in foster care since birth and in the current foster family's care since she was four months old. Whereas L.C. is unable to offer S.C. the permanence she needs, the foster family has consistently provided the stability that S.C. needs. Delaying S.C.'s permanent placement will only work to S.C.'s detriment. Thus, substantial evidence in the record supports the trial court's finding that:
["T]o delay permanent placement will create more harm as this court is doubtful that further training, counselling or therapy could be provided to [L.C.] within a reasonable period of time to make reunification possible.
Third, the trial court adequately examined the alternatives to termination of parental rights and properly determined that family reunification was no longer possible and that some type of placement for S.C. with visitation by L.C. was not viable. The trial court rejected the visitation alternative stating that "[u]nder the facts of this case, such visitation is inappropriate based upon this court's assessment of the harm that has occurred or would befall [S.C.] by continued contact with [L.C.].... Termination of parental rights is best for [S.C.] and her parents under the facts of this case."
S.C. has been in foster care since birth and has been with her current foster family since she was four months old. Both Dr. *426 Dyer and Dr. Bruey testified that S.C. has a strong and powerful bond with her foster family. S.C. has formed strong ties of emotion, love and dependence with her foster family. Foster care has continued for such an extended period of time that a parent-child relationship has been created, albeit not one based upon blood but upon love, affection and need. Thus, the trial court properly concluded that either the sudden or gradual disruption of that relationship would damage S.C. Nothing in New Jersey's statutory scheme requires the attempted creation of a new psychological relationship with the natural mother at the cost of a child's present well-being in an established home in which the child is happy and flourishing.
L.C. suggests that because the foster mother is now dead that she and S.C.'s foster father stand in relation to S.C. in the same posture as divorced parents stand in relation to their children. L.C. views herself as the non-custodial parent and asserts that the court would not "think of terminating the visitation rights of a divorced, non-custodial parent except upon finding behavior far more distressing than can be attributed to L.C." L.C. contends that parental rights are divisible into rights of custody and visitation and an inability to exercise one right does not preclude exercise of the others. We disagree. What L.C. fails to recognize is that this is not a divorce case where visitation is almost invariably granted to the non-custodial spouse. This is a case for termination of parental rights. The trial court properly applied the four prong A.W. test and in so doing, determined that custody in the foster father with continued visitation by L.C. was not a viable alternative.
The trial court's position is consistent with the holdings in Sorentino v. Family & Children's Society of Elizabeth, 72 N.J. 127, 367 A.2d 1168 (1976) (Sorentino I) and Sorentino v. Family & Children's Society of Elizabeth, 74 N.J. 313, 378 A.2d 18 (1977) (Sorentino II), aff'd, 77 N.J. 483, 391 A.2d 497 (1978). Sorentino involved a three year old child who lived with adoptive parents uninterruptedly from the time she was one month old. The hearing, held as a result of Sorentino I, *427 resulted in the conclusion that a transfer of custody would probably seriously harm the child. The Supreme Court, without a specific finding of unfitness or abandonment, severed the parental rights based primarily upon the probability of damage to the child's well-being from a change in custody.
The facts in this case are, if anything, more compelling than they were in Sorentino. S.C. has never lived with L.C.S.C. has been living with her current foster family for four of her four years and four months and has a strong and powerful bond with her foster family. What was stated in Sorentino is equally applicable to this case:
Here, the passage of time permitted the roots to be nurtured and to develop fully. Hence it would appear that no policy of the Act would be ignored by the termination of plaintiffs' rights, should that eventually be deemed appropriate, because there can be no unnecessary separation from a nonexisting relationship. In that event, such termination would tend to promote the policy of preventing interference by establishing the little girl permanently in the home of her adoptive parents. [74 N.J. at 324-25, 378 A.2d 18].
Fourth, the termination of L.C.'s parental rights will result in a permanent resolution of S.C.'s status. If one thing is clear, it is that S.C. needs association with a structured, nurturing environment. "Since it seems generally agreed that permanence in itself is an important part of that nurture, a court must carefully weigh that aspect of a child's life." New Jersey Div. of Youth & Family Servs. v. A.W., 103 N.J. at 610, 512 A.2d 438. Moreover, the court must consider whether the child already developed "a filial relationship [with another] that cannot be destroyed or changed without some risk of emotional harm to the child." Id.
Contrary to L.C.'s claim, no harm would come to S.C. if L.C.'s parental rights are terminated. Sufficient credible evidence supports the trial court's findings that termination of the parental rights will not do more harm than good. Dr. Dyer testified that S.C.'s removal from her foster home would certainly have an adverse short-term effect and an adverse long-term effect on S.C. Dr. Dyer also testified that S.C. is bonded to her foster family and the foster family is likewise bonded to S.C. The *428 foster family provides a calm and structured environment for S.C.
Finally, we are satisfied that the trial court properly denied L.C.'s right of visitation with S.C. Once parental rights are terminated and the child is placed under the guardianship of the Division, an alternative permanent placement is made and the court's jurisdiction ends. See Division of Youth & Family Servs. v. D.C., 118 N.J. 388, 394-95, 571 A.2d 1295 (1990); In re Guardianship of C.W., M.W. and N.F., 183 N.J. Super. 47, 53, 443 A.2d 231 (App.Div. 1982). As our Supreme Court stated in Division of Youth & Family Servs. v. D.C., 118 N.J. at 394-95, 571 A.2d 1295:

N.J.S.A. 30:4C-15 to -24 differs from both N.J.S.A. 30:4C-12 and N.J.S.A. 9:6-8.21 to -8.73 in that it provides for a permanent remedy: termination of parental rights and placement of the child under the guardianship of DYFS. Whereas temporary remedies deprive parents of custody only, leaving the extent of parental visitation for further adjudication, a successful guardianship action under N.J.S.A. 30:4C-15 to -24 necessarily entails a cessation of visitation. That path leads to freeing the child for adoption. N.J.S.A. 30:4C-20. [emphasis added].
See also In re Guardianship of R.O.M.C. and S.A.S.C., 243 N.J. Super. 631, 581 A.2d 113 (App.Div. 1990).
The order terminating L.C.'s parental rights effectively terminates the legal relationship between L.C. and S.C. The effect of termination of parental rights should make S.C. a "stranger" to L.C. The clear language of the applicable statutes precludes the granting of post-termination visitation. It may well be that in certain situations post-termination visitation would be in the best interests of older children who developed a demonstrable bond with their natural parents, but that is not so in this case.
Accordingly, we affirm the judgment under review substantially for the reasons expressed by Judge Harper in his letter opinion of September 6, 1989, as supplemented by his oral opinion of December 20, 1989, denying L.C.'s motion for a stay of the judgment.

*429 II.
We are also satisfied that Judge Harper properly denied L.C.'s motion to compel the Division to pay her expert witness fees of Dr. Bruey and Dr. Fost. First, there is no basis in law or fact to require the Division to reimburse the Community Health Law Project, which represented L.C. in this matter, for the expenses incurred in connection with the retention of expert witnesses on L.C.'s behalf. There is no statutory authorization for the payment of such fees. N.J.S.A. 30:2-1 provides that all appropriations for the Department of Human Services, of which the Division is a part, are to be made as "one item." However, this provision does not suggest that there are funds available for a court to order the payment of experts fees. Moreover, the statutory schemes for all departments, divisions, agencies and other governmental units include general appropriation clauses and to find that N.J.S.A. 30:2-1 allows payment of experts fees would give the court carte blanche to compel the Division to pay for any service that the court felt the Division should provide.
N.J.S.A. 30:4C-29 is for "payments of maintenance" of the Division. That provision grants the Division "such funds as shall be appropriated for the purposes of this act." N.J.S.A. 30:4C-29. The Department of Human Services' total expenditures cannot exceed the sums appropriated by the Legislature. N.J.S.A. 30:2-2. The Division must perform its duties within the limits of the funds appropriated to it. State in Interest of D.F., 145 N.J. Super. 381, 386-87, 367 A.2d 1198 (App.Div. 1976), certif. denied, 74 N.J. 260, 377 A.2d 665 (1977). No provision appropriates funds for experts fees.
Moreover, it is fundamental that the judicial branch of government cannot order appropriations in the absence of statutory authority. "No money may be drawn from the State treasury but for appropriations made by law. The judiciary [can]not order the Legislature to appropriate money, or the Governor to approve an appropriation if one were made." *430 Division of Youth & Family Servs. v. D.C., 118 N.J. at 399, 571 A.2d 1295 (quoting Fitzgerald v. Palmer, 47 N.J. 106, 108, 219 A.2d 512 (1966) (citing N.J. Const. of 1947 art. VIII, § 2, ¶ 2)). As our Supreme Court stated in City of Camden v. Byrne, 82 N.J. 133, 148-49, 411 A.2d 462 (1980):
New Jersey courts have consistently adhered to the principle that the power and authority to appropriate funds lie solely and exclusively with the legislative branch of government. There can be no redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over state appropriations. (Citations omitted).
Thus, the Supreme Court endorsed the holding of Amantia v. Cantwell, 89 N.J. Super. 7, 13, 213 A.2d 251 (App.Div. 1965), which declared "whether or not petitioners receive the money to which they are clearly entitled rests with the Legislature."
Secondly, the Community Health Law Project chose the experts which they determined were needed without regard to cost, funding, source or the needs of other clients. The Division certainly had no control over or input into these decisions. Since the Community Health Law Project is funded specifically to litigate cases such as this, it has the financial burden and responsibility to provide and pay counsel and necessary expert fees.
Finally, even assuming that the Division had a duty to assure L.C. access to competent experts to help examine and assist in evaluating, preparing and presenting S.C.'s medical condition and L.C.'s ability to parent, that duty was not violated in this case. Prior to engaging Dr. Bruey, the Community Health Law Project sought and obtained Division funds to retain an independent expert, Dr. Dyer. While it is true that L.C.'s counsel suggested both Dr. Dyer and Dr. Bruey as sources for an independent examination, the parties agreed to Dr. Dyer as a joint expert to be paid by the Division. Additionally, Dr. Fost's testimony generally was consistent with the testimony given by S.C.'s treating physician, Dr. Aguila, and since there is no evidence in the record suggesting that Dr. Aguila was not equally available to L.C., the Community Health Law Project should not receive funds to pay the expert fees of Dr. Fost. *431 Indigent litigants in cases of this kind do not have a limitless right in selecting experts of their own choosing and imposing the cost thereof on the State. As the United States Supreme Court so appropriately observed in Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53, 66 (1985), "[t]his is not to say ... that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own."

III.
Since this matter involved the termination of parental rights, we accelerated the appeal and directed the Clerk of the Appellate Division to send the audiotapes of the proceedings in the trial court to an appropriate transcribing service for transcription in accordance with the Supreme Court Directive No. 98-89, dated September 20, 1989, entitled "Appeal from Family Division  Appellate Custody and Termination Systems (ACTS)." Further, we ordered that the issue concerning who should reimburse the Administrative Office of the Courts for payment of the transcript be determined by this court or that the matter be remanded to the trial court following the determination of the merits of the appeal. Thus, while we affirm the judgment and post-trial order under review, we remand the matter to the trial court for determination as to who should pay the costs of the transcript in accordance with Directive No. 98-89.