643 A.2d 987

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–APPELLANT, v. K.M., SR., DEFENDANT–RESPONDENT.

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–APPELLANT, v. R.M., DEFENDANT–RESPONDENT,IN THE MATTER OF: S.W., K.M., JR., AND R.M., MINORS–APPELLANTS. (TWO CASES)

Argued February 28, 1994—Decided March 11, 1994.

*Mark Singer*, Deputy Attorney General, argued the cause for appellant Division of Youth and Family Services (*Deborah T. Poritz*, Attorney General of New Jersey, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel).

*Janet L. Fayter* argued the cause for appellant Law Guardian on behalf of minors S.W., K.M., Jr., and R.M. (*Susan L. Reisner*, Acting Public Defender, attorney; *James A. Louis*, Deputy Public Defender, of counsel; *Ms. Fayter*, *Mr. Louis*, and *Phyllis G. Warren*, Assistant Deputy Public Defender, on the briefs).

*Michele A. Adubato*, Designated Counsel, argued the cause for respondent K.M., Sr. (*Susan L. Reisner*, Acting Public Defender, attorney).

*Jay M. Grossman*, Designated Counsel, argued the cause for respondent R.M. (*Susan L. Reisner*, Acting Public Defender, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the intervention of the New Jersey Division of Youth and Family Services ("DYFS") with one troubled family in two separate court proceedings. DYFS first brought a Title 9 abuse-or-neglect proceeding against defendants seeking temporary custody of their children. The trial court found for DYFS and awarded it custody of the children for eighteen months. While that disposition was still subject to appeal, DYFS brought a Title 30 proceeding against defendants seeking to terminate their parental rights and assume permanent guardianship of the children. Soon thereafter defendants appealed the abuse-or-neglect case. While that appeal was pending, the Title 30 proceeding was concluded, resulting in termination of defendants' parental rights. That decision was not appealed.

Despite the termination of defendants' parental rights, the Appellate Division continued its review of the abuse-or-neglect action. In an unreported opinion it affirmed the trial court's

determination that the children had been abused and neglected but reversed and remanded the trial court's order granting DYFS custody for eighteen months. Further, it found that "it was improper for DYFS to proceed with the termination proceedings while this matter was before us * * *." Accordingly, it ordered the trial court in the termination proceeding "to entertain a prompt application for relief under *R.* 4:50–1 from [its] final order of termination * * *."

This appeal presents two issues: whether DYFS may bring a Title 30 termination proceeding while an earlier Title 9 abuse-or-neglect proceeding against the same parents is still subject to appeal, and whether the Appellate Division, in its review of the abuse-or-neglect appeal, properly directed another trial court to vacate its order to terminate the parental rights of the same family.

We conclude that DYFS is statutorily empowered to bring concurrent but separate Title 9 abuse-or-neglect proceedings and Title 30 termination proceedings against the same family. Further, we conclude that the Appellate Division erred by addressing the termination decision not before it.

I

Defendants R.M. and K.M., Sr. are the parents of three children: S.W., born August 15, 1986; K.M., Jr., born May 22, 1988; and R.M., born March 15, 1989. Unlike the stereotype of a troubled family that draws the attention of DYFS, no substance abuse or physical abuse is involved in this case. The father has been fairly consistently employed, while the mother has remained at home with the three young children. Although physically and financially capable of doing so, the parents have failed to provide for their children's basic needs of food, clothing and shelter.

DYFS first became involved with the family in June 1989, when S.W. fell from a window of the family's second-story apartment. Miraculously, she was not injured but the DYFS investigation that

followed uncovered dangerous and filthy living conditions in the home. The one-room apartment was roach-infested, with holes in the walls, exposed wiring, open windows without screens, and gnats stuck to dried paint on the walls. Although some of these deplorable conditions were attributable to the landlord, DYFS concluded that defendants lacked essential parenting skills. R.M. and K.M., Sr. voluntarily placed their children in foster care the same month.

While the children were away, defendants moved to a three-bedroom apartment in Atlantic City and signed a service agreement with DYFS. In the agreement, R.M. and K.M., Sr. agreed to provide the children with a clean home and provide adequate medical care. DYFS' concern for the children's medical care focused primarily on R.M., the youngest, who was born prematurely weighing only two pounds, nine ounces, and who had gained very little weight under defendants' care due to inadequate and infrequent feeding and no medical attention. R.M.'s medical problems were so severe that he had to remain in foster care for a few weeks after S.W. and K.M., Jr. were returned to their parents to stabilize his condition.

DYFS made regular visits to the home after the children were returned, and again found substandard living conditions. The children were inadequately dressed, wearing only dirty undershirts and dirty diapers, and the home itself was persistently filthy. Due to improper feeding, the children had lost weight after being returned to their parents. R.M.'s medical condition was particularly precarious, and on November 30, 1989, he was hospitalized for failure to thrive, dehydration and malnutrition. He was immediately placed in foster care with his parents' consent on his release from the hospital.

With only S.W. and K.M., Jr. remaining in the home, defendants signed a second service agreement with DYFS. They then entered an intensive parenting-skills program at the Family Life Center that offered supervised interaction between the parents and the children for eight hours a day, five days a week. Even

that, however, did not improve the conditions at defendants' home. On February 8, 1990, defendants again voluntarily placed S.W. and K.M., Jr. in foster care. Since that date, the children have not been placed back into their parents' custody. Defendants continued their parenting skills courses on an irregular basis.

On October 25, 1990, defendants sought the return of their children by revoking the voluntary-placement agreements. DYFS was then faced with two options: return the children or file for custody of the children under Title 9. It chose the latter, as the parents had made no visible progress at the Family Life Center and still posed a risk to the children. In addition, despite the many services DYFS provided to the family, including a registered nurse who visited the home regularly and the Jewish Family Service In–Home Treatment Program to provide parenting-skill counseling, personnel from the various services continued to report on-going neglect.

## II

DYFS filed a verified complaint to begin an abuse-or-neglect proceeding seeking temporary custody of the three children under *N.J.S.A.* 9:6–8.21 to –8.73 and *N.J.S.A.* 30:4C–12. At the abuse-or-neglect proceeding, DYFS presented the testimony of two caseworkers assigned to the family as well as testimony from the director of the Family Life Center. The trial court correctly applied the standard that "any determination that the child [has been abused or neglected] must be based on a preponderance of the evidence" under *N.J.S.A.* 9:6–8.46b, and found that the children had been abused or neglected. Its findings included the following:

> R.M. failed to thrive as a result of improper feedings by the defendants ... that the emotional condition of all three children was impaired as a result of the parents' failure to exercise a minimum degree of care ... that [S.W.] suffered from bottle mouth ... the parents failed to provide proper supervision ... that R.M. does not have insight into [R.M.'s feeding] problem ... that defendants failed to exercise a minimum degree of care in supplying their children with adequate food, clothing, medical care, though having means to do so.

After a series of initial hearings, the trial court on July 16, 1991, entered a final order of disposition continuing DYFS' custody of the children.

[I]t does not appear that [defendants] have the ability to understand what must be done and the capability to carry forward with that understanding to properly take care of the children on a daily basis ...

On October 23, 1991, defendants appealed the abuse-or-neglect decision. By the time the matter was submitted to the Appellate Division on November 16, 1992, the children had been in foster care nearly three years.

On October 16, 1991, however, DYFS filed a complaint for guardianship pursuant to *N.J.S.A.* 30:4C–12 to –22, seeking termination of defendants' parental rights and for guardianship of the children. None of the attorneys in the termination matter had participated in the initial abuse-or-neglect matter. Different judges also presided over the two matters.

After a lengthy trial, the trial court rendered an oral decision in the termination case on March 23, 1993. Based on much of the same evidence before the trial court in the abuse-or-neglect proceeding, plus psychological evaluations of defendants and evidence of their lack of progress since the determination of abuse-and-neglect, the trial court terminated defendants' parental rights and granted guardianship of the children to DYFS. The court found that the "health and development of all three children have been seriously impaired by the parental relationship." The court also cited numerous incidents of abuse and neglect, such as S.W.'s fall from a window, S.W.'s rotten teeth caused by improper feeding, deplorable living conditions that were not the result of poverty, the children's and parents' routinely filthy physical appearance and foul odor, the parents' failure to nurture R.M., which caused him to become listless and almost without a personality, all the children's developmental delays, and defendants' failure to follow through with proper medical care. In terminating parental rights the court found that

[t]hese children were exposed to dangerous situations by parents who did not and do not have the ability to anticipate or appreciate situations which pose serious physical and emotional risk to their children....

The court also found that DYFS worked extensively to reunite the family, but that there was "literally no improvement!" And, specifically with regards to R.M., the court noted that the parents had not visited him since October 1990 and that the "positive transformation of R.M. since he has been in foster care is quite remarkable." The final order for guardianship was filed on April 20, 1993. No appeal was taken from the order. Nor did defendants ever seek a stay of the termination proceeding.

On June 12, 1993, the law guardian for the minors in the Title 30 termination matter advised the Appellate Division panel that was reviewing the abuse-or-neglect matter that another trial court had granted DYFS a Final Order of Guardianship terminating defendants' parental rights. Nevertheless, on August 4, 1993, four months after that termination was ordered, the Appellate Division issued its opinion in the abuse-or-neglect case—almost three years after DYFS originally brought the abuse-or-neglect proceeding, almost two years after DYFS brought the termination proceeding, and almost four months after the termination proceeding was concluded.

On ordering the remand, the Appellate Division directed the trial court that heard the abuse-or-neglect case to (1) conduct a hearing to determine whether the children could be returned to the parents; (2) require DYFS to provide appropriate services; and (3) suspend further disposition. The Appellate Division also instructed the trial court that had heard the termination matter to entertain a prompt application to set aside its final termination order, and found that the termination trial should have been delayed until the child-abuse appeal had been concluded. The Appellate Division entered that judgment despite the fact that the termination matter was not before it and that it had never reviewed the record in that trial.

DYFS' motion for reconsideration was denied by the Appellate Division, and we granted certification, 135 *N.J.* 300, 301, 639 *A.*2d 301 (1994).

Because we determined that the interests of justice required a prompt disposition of DYFS' appeals, prior to issuing this opinion, we entered a three-part order affirming the Appellate Division's affirmance of the court's finding of abuse and neglect, reversing the Appellate Division's reverse and remand of the trial court's grant of the custody application in the abuse-or-neglect matter, and reversing the Appellate Division's direction to the trial court in the termination proceeding to entertain a motion to vacate its order of termination.

## III

Abuse-or-neglect and termination proceedings are brought under separate statutory schemes, require different burdens of proof, and allow for different remedies. The applicable statutes do not prohibit DYFS from bringing a termination proceeding while an abuse-or-neglect proceeding was pending in the court. Not only *may* DYFS bring such actions concurrently, but in many instances DYFS in fact *must* bring concurrent actions to remain in compliance with Title 30.

Abuse-or-neglect proceedings are brought under *N.J.S.A.* 9:6–8.21 to –8.73, collectively known as Title 9. The definition of an abused or neglected child is provided in *N.J.S.A.* 9:6–8.21:

c. "Abused or neglected child" means a child less than 18 years of age whose parent or guardian, as herein defined * * * (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; * * * (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardian-

ship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof * * *.

Therefore, either the action or the inaction of a parent, as is the case here, may constitute grounds to find abuse or neglect.

On the confirmation of abuse or neglect, *N.J.S.A.* 9:2–18 permits agencies to file a complaint in Superior Court seeking to terminate parental rights pursuant to Title 30. However, termination proceedings, which are brought pursuant to *N.J.S.A.* 30:4C–15, do not *require* a prior determination of abuse or neglect. The statute, in fact, offers a number of possible bases on which to initiate a termination proceeding:

Whenever (a) it appears that a court wherein a complaint has been proffered as provided in ... Title 9 ... has entered a conviction against the parent or parents, guardian, or person having custody and control of any child because of abuse, abandonment, neglect of or cruelty to such child; or ... (c) it appears that the best interests of any child under the care or custody of the Division of Youth and Family Services require that he be placed under guardianship; or (d) it appears that a parent or guardian of a child ... has failed for a period of one year to remove the circumstances or conditions that led to the removal or placement of the child, although physically and financially able to do so, notwithstanding the division's diligent efforts to assist the parent or guardian in remedying the conditions, and that additional services available from the division within program and fiscal constraints will not enable the child to be reunited with the parent or guardian; a petition setting forth the facts in the case, may be filed with the Family Part of the Chancery Division of the Superior Court in the county where such child may be at the time of the filing of such petition. A petition as provided in this section may be filed by any person or any association or agency, interested in such child, or by the division in the circumstances set forth in items (c) and (d) hereof.

[*N.J.S.A.* 30:4C–15.]

As stated above, "a petition ... *may* be filed" to terminate parental rights where one of the aforementioned criteria have been met. *Ibid.* (emphasis added). Therefore, a finding of abuse or neglect under Title 9 is only one of the bases on which DYFS or "any person or any association or agency, interested in such child" may initiate a termination proceeding. *Ibid.* Moreover, the statute makes clear that that is not the only basis for such a petition, nor is it a requisite basis.

■ *N.J.S.A.* 30:4C–15.1, on the other hand, *requires* DYFS to file for guardianship by instituting a termination proceeding when such action would be in the best interest of the child:

> The division shall initiate a petition to terminate parental rights on the grounds of the "best interest of the child" pursuant to [*N.J.S.A.* 30:4C–15] ... if the following standards are met:
>
> a. The child's health and development have been or will continue to be endangered by the parental relationship;
>
> b. The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> c. The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> d. Termination of parental rights will not do more harm than good.
>
> [*N.J.S.A.* 30:4C–15.1.]

DYFS' discretion to act in those cases is limited, as it "*shall* initiate a petition to terminate parental rights on the grounds of the 'best interest of the child'" so long as the four criteria are met. *Ibid.* (emphasis added).

■ The burden of proof under both statutes is also different. The burden of proof in abuse-or-neglect proceedings is that any determination of abuse or neglect must be based on a preponderance of the evidence. *N.J.S.A.* 9:6–8.46. The burden of proof in a Title 30 termination case, however, is the higher clear-and-convincing-evidence standard. *In re Guardianship of J.C.*, 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992).

The remedies available in a termination proceeding also differ from the eighteen-months-custody remedy available in abuse-or-neglect determinations. If a court determines that a child has in fact been abused or neglected, Title 9 authorizes the court to place a child in protective custody with a relative or DYFS pursuant to *N.J.S.A.* 9:6–8.54a, but the initial placement can be only for a period of up to eighteen months. *N.J.S.A.* 9:6–8.54b. As described in *New Jersey Division of Youth & Family Services v. D.C.*, 118 *N.J.* 388, 394–95, 571 *A.*2d 1295 (1990),

> [Title 30] differs from … [Title 9] in that it provides for a permanent remedy: termination of parental rights and placement of the child under the guardianship of DYFS. Whereas temporary remedies deprive parents of custody only, leaving the extent of parental visitation for further adjudication, a successful guardianship action under [the termination statute] necessarily entails a cessation of visitation. That path leads to freeing the child for adoption.

Title 30's "freeing the child for adoption" is therefore very different from the temporary remedies available with an abuse-or-neglect finding.

Recognizing the separate and distinct natures of Title 9 and Title 30 proceedings, we conclude that they may proceed independently of each other. That result also furthers the important policy preference for the permanent placement of children. In the Child Placement Bill of Rights Act, *N.J.S.A.* 9:6B–1 to –6, all children placed outside their homes by DYFS or other agencies have the right to a placement plan "designed to facilitate the permanent placement or return home of the child in a timely manner." *N.J.S.A.* 9:6B–4j. The Legislature explicitly recognized the benefits of permanent placement for children in the Child Placement Act:

> b. Research has shown that the longer children remain in the foster care system, the greater number of placements they experience. As a result of these multiple placements, from natural family to foster home and from one foster home to another foster home, children develop emotional and psychological problems, making it more difficult for them to develop a positive self-image; and

> \* \* \* \* \* \* \* \*

> d. The obligation of the State to recognize and protect the rights of children in the child welfare system should be fulfilled in the context of a clear and consistent policy which limits the repeated placement of children in foster care and promotes the eventual placement of these children in stable and permanent homes.
>
> [*N.J.S.A.* 30:4C–53.1.]

In recognition of that preference for permanency for children, DYFS is required to prepare a placement plan with a goal of permanency for any child placed in foster care for the second time. *N.J.S.A.* 30:4C–53.3. Also, the "best interests" test under *N.J.S.A.* 30:4C–15.1 requires finding that a delay of permanent placement further harms a child. Case law also supports the importance of permanency for children. *See New Jersey Div. of*

*Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 610, 512 *A.*2d 438 (1986) (stating that permanence is important to nurturing child); *In re Guardianship of S.C.,* 246 *N.J.Super.* 414, 425, 587 *A.*2d 1299 (App.Div.) (finding that delay of permanent placement would "only work to [child's] detriment"), *certif. denied,* 126 *N.J.* 334, 598 *A.*2d 891 (1991).

If DYFS cannot bring a termination proceeding until an abuse-or-neglect action finally winds its way through the courts, the Legislature's goal of achieving permanency in the placement of children will be frustrated and the child will suffer. For example, in the almost three years that passed between the time the abuse-or-neglect complaint was filed to the time the Appellate Division remanded the matter for a new disposition, both S.W. and K.M., Jr. lost a potential pre-adoptive home because of the uncertainty of their availability for adoption and the family's unwillingness to take the emotional risk of bonding with the children in the face of that uncertainty.

## IV

Although DYFS properly commenced both the Title 9 and Title 30 proceedings, its handling of both matters should have been better coordinated. This case should never have become so complicated. In our recent decisions in *New Jersey Division of Youth and Family Services v. E.B. & D.W.,* 136 *N.J.* 546, 552, 643 *A.*2d 987 (1994) and *In re Guardianship of G.S. III,* 137 *N.J.* 168, 179–80, 644 *A.*2d 1088 (1994), we discussed the overlap of Title 9 and Title 30 in connection with the payment of litigation expenses for indigent defendants. In *E.B. & D.W., supra,* we recognized that "DYFS's statutory mission is to protect the health and welfare of the children of the State" and that it does so under both Title 9 and Title 30. 137 *N.J.* at 172, 644 *A.*2d 1088. We likewise recognized the "overlapping of Titles 9 and 30 causes occasional misunderstanding." *Id.* at 173, 644 *A.*2d 1096. Specifically, referring to this case, we noted that although termination of parental rights can occur without child abuse and neglect, "such over-

lapping often occurs when child abuse or neglect is involved in Title 30 parental-rights-termination cases." *Ibid.* In *Guardianship of G.S. III, supra,* we noted the "unnecessary complexity introduced into the disposition by the parallel but not congruent track of Title 9 and Title 30 proceedings." 137 *N.J.* at 179, 644 *A.*2d 1088.

We recognize that many problems arise, as in this case, because Title 9 provides compensation for legal representation of indigents and Title 30 does not. In *D.C., supra,* 118 *N.J.* 388, 571 *A.*2d 1295, we held that attorneys assigned to represent indigent parents and their children in Title 30 parental-rights-termination proceedings were not entitled to public compensation. Instead, we required lawyers to provide *pro bono* service. See *R.* 3:27–2.

Many times, therefore, different attorneys represent the same defendants in two separate actions concerning their parental rights. Defendants R.M. and K.M., Sr. were represented by different counsel in all three proceedings: the abuse-or-neglect proceeding, the termination proceeding, and, finally, the abuse-or-neglect appeal. Separate counsel not only made this matter unnecessarily complicated but their lack of communication and the resulting delays caused by both the parties and the courts in the proceedings may also have caused irreparable damage to three small children.

Although the situation would be much better if defendants had had the same attorney in the various proceedings, DYFS was the moving party in both actions. DYFS was also represented by the Office of the Attorney General in both proceedings, albeit not by the same deputy attorney general. Unfortunately, it seems that none of the attorneys were aware that the two proceedings involved the same defendants.

This Court cannot micromanage DYFS or any other agency. We are aware of the overwhelming numbers of matters handled by DYFS. However, once the institutional decision was

made by DYFS to pursue a permanent remedy of guardianship via a termination proceeding, the court that was handling the appeal of the abuse-or-neglect determination should have been promptly notified so that a motion could be made either to stay or to dismiss that appeal.

At oral argument, we were advised that this was an unusual case, and that typically on the filing of the termination complaint, a motion to stay or dismiss an appeal in the abuse-or-neglect proceeding is made. Nonetheless, to avoid this confusion from recurring, we suggest that one caseworker and one deputy attorney general be assigned to one family. Thus, at least one person other than defendants would have knowledge of both proceedings.

We understand that having one caseworker and one deputy attorney general may be hard to implement, given DYFS' current workload. Likewise, we recognize that the traditional notion of one court/one family may be difficult to practice with the massive numbers of family matters on the dockets. However, if one caseworker working with the same deputy attorney general notified the court of all cases involving the same family, unnecessarily repetitive or potentially moot cases, such as the appeal of the abuse-or-neglect determination in this case, may be eliminated and the process can be streamlined.

We also must recognize that this multiple litigation raises issues of fairness to the parties. The parents, R.M. and K.M., Sr., had to defend their interests on two fronts involving common issues. Accordingly, we renew our suggestion that the

> Legislature could combine both avenues of child advocacy under a single title with a single mandate to OPD to provide the necessary representation. Any savings thought to be achieved by current use of pro bono lawyers may be diluted by the legal maneuvers required to sort out the differing responsibilities of DYFS, OPD, the private bar, and public-interest firms.
>
> [*Guardianship of G.S., supra*, 137 *N.J.* at 179–80, 644 *A.*2d 1088.]

## V

The second issue presented in this case is whether the Appellate Division may review a judgment not before it when a related case

has been appealed. As previously described, during the Appellate Division's review of the trial court's abuse-or-neglect determination, the Appellate Division ordered the trial court that heard the termination case to entertain a motion for relief from its judgment of termination.

As previously found, a Title 9 abuse-or-neglect action is a separate cause of action from a Title 30 termination action. An appeal in one does not grant the Appellate Division jurisdiction over the other. Similar issues and facts will undoubtedly appear in the two actions, but the parties are responsible for determining whether they will appeal a determination. An appeal "may be *taken to* the Appellate Division" by a party as of right or by leave. *R.* 2:2–3(a), (b) (emphasis added). Because the termination proceeding was not appealed, it was final.

## VI

For the aforementioned reasons, we affirm the Appellate Division's affirmance of the court's finding of abuse and neglect, reverse the Appellate Division's reverse and remand of the trial court's grant of the custody application in the abuse-or-neglect matter, and reverse the Appellate Division's direction to the trial court in the termination proceeding to entertain a motion to vacate its order of termination.

*For affirmance in part; for reversal in part*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.