706 A.2d 226

IN THE MATTER OF THE GUARDIANSHIP OF K.H.O.

Superior Court of New Jersey
Appellate Division

Argued January 21, 1998—Decided February 20, 1998.

434

Before Judges PRESSLER, CONLEY and CARCHMAN.

*Michael J. Doherty,* argued the cause for appellant, B.S. (*Lerner, David, Littenberg, Krumholz & Mentlik,* attorneys; *Mr. Doherty,* on the brief).

*Lisa B. Landsman,* Deputy Attorney General, argued the cause for respondent, New Jersey Division of Youth and Family Services (*Peter Verniero,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Landsman,* on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

This appeal arises in the unfortunate and, we fear, not uncommon setting of a drug-addicted parent who, during the first four years of her child's life and despite extensive drug programs offered through the auspices of the Division of Youth and Family Services (DYFS), has not been able to overcome her addiction to the satisfaction of DYFS. As a result, while permitted visitations with her child, she has never become a custodial parent and the child has bonded with her foster parents who now want to adopt her. DYFS' application to terminate parental rights so as to free the child for the adoption was successful.[1] Because, given the existing law and the practicalities of the adoption procedure, termination and adoption effectively severs forever the child's biological relationships,[2] what this termination proceeding ulti-

---

[1] The complaint also sought to terminate the parental rights of K.O.'s natural father, D.O. Though served, he has never responded or opposed termination as to him.

[2] Under the existing law, termination severs all legally mandated ties with the parent. We are not so sure as to extended biological family members, particu-

mately may present is the choice of maintaining those relationships with continued foster care on the one hand, and the perceived need for "permanency and stability" in the form of freeing K.O. for adoption on the other. The choice is made particularly difficult because the adoptive parents have no legal obligation to ensure that K.O.'s contacts with her biological family, including her grandmother and brother with whom she has had a significant relationship, continue.

It is a choice that, we think, implicates primarily the first and fourth prong of the "best interests" test of *N.J.S.A.* 30:4C–15.1(a) and *New Jersey Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591, 604–05, 512 *A.*2d 438 (1986). In this respect, we are convinced the record before us is insufficient to demonstrate clearly and convincingly that B.S.'s unsuccessful efforts to overcome her drug problem, thus leaving her child in foster care, have yet reached the level of unremediable parental harm, and that termination of B.S.'s parental rights, and thus K.O.'s biological ties, will not do more harm than good. Were there an evidential basis before us for concluding, clearly and convincingly, that K.O.'s best interests require familial closure now, we of course would affirm the termination. Quite simply, there is not.

*I*

The essential facts are easily depicted. During her pregnancy with K.O., not to mention thereafter, B.S. used drugs. K.O. was born on August 31, 1993 with a cleft palate, respiratory problems and addicted to heroin. B.S., occasionally, lives with her mother,

---

larly grandparents and siblings. *Cf. S.M. v. A.W.*, 281 *N.J.Super.* 63, 656 *A.*2d 841 (App.Div.), *certif. denied*, 142 *N.J.* 571, 667 *A.*2d 189 (1995) (according maternal grandmother rights to seek custody of grandchild where deceased daughter's parenting deficiencies led to foster care.). Their continued rights to court ordered visitations, for instance, may well survive termination of the parental rights. *See N.J.S.A.* 9:2–7.1; *R.K. v. A.J.B.*, 284 *N.J.Super.* 687, 666 *A.*2d 215 (Ch.Div.1995). But the practicalities of such continued contact with the extended biological family may well discourage judicial enforcement of such post-adoption contact. *See Mimkon v. Ford*, 66 *N.J.* 426, 332 *A.*2d 199 (1975).

O.S., who cares for B.S.'s other child, J.S. When O.S. advised DYFS that she could not care for the newborn, B.S. agreed to a temporary foster home for K.O.

K.O. was discharged from the hospital on September 29, 1993 into the care of her foster parents with whom she has lived ever since. It is undisputed by all that K.O. has bonded with her foster parents, and has thrived in their care. It is also undisputed that though B.S. has entered a number of drug treatment programs, she did not complete many and none have been successful. Moreover, although she has maintained visits with K.O., the visitations have not always been as scheduled or on a regular basis. It is somewhat unclear from the record exactly how many visits there were. According to DYFS' psychologist, Dr. Chorost, who did not testify at the termination trial but whose reports were put in evidence, the foster mother told him that there might have been a total of thirty visits over a three year period. During the termination hearing, there was some mention of 82 out of 84 scheduled visits. The caseworkers' records, however, do not support these figures. In any event, the caseworker who testified at the termination proceeding admitted that many of the missed visitations were not B.S.'s fault. We have the distinct sense that, at least after DYFS determined adoption by the foster parents was preferable to reunification, DYFS was less than diligent in promoting any continued relationship between K.O. and her biological family.

In any event, it is clear that while K.O. has "bonded" with her foster parents, calling them "Mom" and "Dad," she as well has a good relationship with her mother. The January 2, 1997 report of Dr. Chorost reflects that she refers to B.S. as her "friend" or her "Mom." The record also reflects that K.O. views herself as having "two Mommies." Moreover, and just as importantly, the record reflects that B.S. has an extended family, including her other child, J.S., and her mother, O.S. These are K.O.'s biological brother and grandmother, with whom K.O. had a positive relationship, at least while visitations were occurring in O.S.'s home where J.S. resides.

DYFS filed its complaint for termination on August 7, 1996.  On January 2, 1997, Dr. Chorost submitted his report in which he depicts the results of his psychological evaluations of B.S. and K.O.  The report reflects a full awareness of B.S.'s drug addiction and her persistent drug treatment efforts since the birth of K.O. The report also reflects the doctor's awareness that, as of January 2, 1997, those efforts had been unsuccessful, largely as a result of B.S.'s inability to regularly attend the various programs or to follow through with what was required.  Thus, Dr. Chorost concluded in his January 2, 1997 report that while his testing and evaluation revealed no "significant thinking or emotional disorder which would impair [B.S.'s] parenting ability[,]" her "admitted chronic and as yet unresolved drug use problem call out for caution...."  But he did not recommend terminating the parental relationship.  Rather, his caution was related to immediate reunification.  In this respect, he opined that "[h]er history of incomplete treatments for the drug dependency and her pattern of missed appointments with [K.O.] and other Division appointments give this examiner no confidence in recommending to the Court that [B.S.] is now ready to take full and responsible care of [K.O.]."  Dr. Chorost also observed the psychological bonding between K.O. and the foster parents.  His opinion was that K.O. would not be harmed by a continuation of the foster care situation, but said:

> *for the long term, this examiner recommends to the Court that visits between K.O. and B.S. be increased in frequency and duration in preparation for an eventual return to the natural mother when the latter can demonstrate a stable social and drug free life style.  The child gives evidence that, although she has a history of initial stranger anxiety, she has a good resilience in adapting to change and is able to establish and maintain healthy secondary relationships.* There is also no evidence to suggest that K.O. now presents a "special needs" situation.  With these factors in mind and within the limits of psychological certainty, K.O. should be able to adjust to her natural mother if she is afforded the opportunity for a closer interaction with her and if she perceives a cooperative relationship between the two women who seem to love her.
>
> Although adversaries in the custody issue, both B.S. and [the foster mother] have expressed a genuine respect for each other and an interest in keeping in touch with each other in the future.  *In light of this positive mutual relationship it would be*

*in K.O.'s best interests to promote the child's sense of continuity with both of these caring and significant adults.*

[Emphasis added.]

The evident thrust of the State's expert's opinion is that continued relationships with both B.S. and the foster parents would not be harmful to K.O., indeed would be beneficial, but with the primary goal still being reunification with B.S. This opinion was expressed in light of a full disclosure of B.S.'s drug problem, and her deficiencies and inabilities in handling that problem. Yet, inexplicably, on March 13, 1997, four days before the trial and after DYFS notified him that B.S. had tested positive for drugs on February 24, 1997, not a surprising fact, Dr. Chorost faxed to the Deputy Attorney General (DAG) a handwritten note that says *in toto:*

Please be advised that I am in receipt of your March 12th fax memo of the results of the urine drug screen submitted by B.S. on February 24, 1997. The findings were positive for both cocaine and opiates and B.S.'s behavior reportedly gave the examiner an impression that she was "nodding from heroin."

As noted in my report of January 2, 1997 "... the admitted chronic and as yet unresolved drug use problem call[s] for caution before giving B.S. a clean bill and allowing the natural mother to receive primary custody of her children."

The recent findings add strongly to my reticence to recommend a return of the children to B.S. *The natural mother has perpetuated a behavioral pattern which impels toward a recommendation that the children be freed for adoption.*

[Emphasis added.]

Thus, whereas as of January 2, 1997, Dr. Chorost had recommended continuation of K.O.'s biological relationships, suddenly just four days before trial and in response to the DAG's tip of continued drug use, the doctor did an about-face, now recommending severance of those ties. But the "behavioral pattern" "perpetuated" by B.S. was no better or worse on March 13 than it was on January 2. We are left to wonder what had so substantially changed to justify the doctor's sudden change.

Naturally, we would have expected that with such a change of professional opinion, Dr. Chorost would have been called by DYFS to testify. He was not. The only witnesses at trial were the current DYFS caseworker, who essentially provided the background information, and the law guardian that had been appointed

for K.O. and who attested to the loving and caring home environment provided K.O. in her foster home. Interestingly, he offered no factual observations as to K.O.'s relationship with B.S. or with her grandmother and natural brother. The entire DYFS caseworker file, of course, was admitted into evidence, as was Dr. Chorost's January 2, 1997 report and his handwritten March 13, 1997 fax addendum. This forms the entire record upon which B.S.'s parental rights, and thus K.O.'s biological ties, were severed. Much more is needed. *E.g., In the Matter of the Guardianship of J.C.*, 129 *N.J.* 1, 22, 608 *A.*2d 1312 (1992). *Cf. Kinsella v. Kinsella*, 150 *N.J.* 276, 318–19, 696 *A.*2d 556 (1997).

## II

Termination of the biological ties was sought here under the "best interests" of the child test as set forth in *N.J.S.A.* 30:4C–15.1(a). Both the Legislature and the Supreme Court, however, have made clear that termination of these ties, even under the best interests rubric, requires clear and convincing evidence of the following:

(1) The child's health and development have been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. . . . ;

(3) The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a).]

*New Jersey Div. of Youth & Family Servs. v. A.W.*, 103 *N.J.* 591, 604–05, 512 *A.*2d 438 (1986); *New Jersey Div. of Youth & Family Servs. v. V.K.*, 236 *N.J.Super.* 243, 262, 565 *A.*2d 706 (App.Div. 1989), *certif. denied*, 121 *N.J.* 614, 583 *A.*2d 315, *cert. denied sub nom. Kliewer v. New Jersey*, 495 *U.S.* 934, 110 *S.Ct.* 2178, 109 *L. Ed.*2d 507 (1990) (" '[i]t is clear that a 'best interests' determination is never sufficient to terminate parental rights; the statutory criteria must be proved.' ") (quoting *In the Matter of Baby M.*, 109

*N.J.* 396, 428–29, 537 *A.*2d 1227 (1988)). *And see A.W., supra,* 103 *N.J.* at 603, 512 *A.*2d 438 ("the 'best interests' of a child can never mean the better interests of the child."). This is so because:

> The right of a parent to enjoy a relationship with his or her child is considered fundamental, and is constitutionally protected. *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L. Ed.*2d 551 (1972); *New Jersey Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 599, 512 *A.*2d 438 (1986). Termination of parental rights—in contrast to the loss of custody of one's children—permanently severs the relationship between children and their biological parents. *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992). The United States Supreme Court in *Santosky v. Kramer,* 455 *U.S.* 745, 762–64, 102 *S.Ct.* 1388, 1399–1400, 71 *L. Ed.*2d 599, 612–13 (1982), has evaluated the evidentiary standard to be applied in termination proceedings, and held that the constitutional concern for the parental interest is heightened by a combination of factors. Those factors include the nature of this fundamental right, the permanency of the threatened loss, the complexity and subjectivity involved in evaluating parental fitness.
>
> [*In the Matter of the Adoption of Children by L.A.S.,* 134 *N.J.* 127, 132–33, 631 *A.*2d 928 (1993).]

All doubts must be resolved against termination of the biological ties. *Id.* at 133, 631 *A.*2d 928; *In the Matter of the Adoption of Children by D.,* 61 *N.J.* 89, 93, 293 *A.*2d 171 (1972).

■ The concern, moreover, is not just severance of biological ties from the perspective of the parent, but just as importantly, perhaps more so, from that of the child. *See New Jersey Div. of Youth & Family Servs. v. T.C. & I.R.,* 251 *N.J.Super.* 419, 439–40, 598 *A.*2d 899 (App.Div.1991), *certif. denied,* 146 *N.J.* 564, 683 *A.*2d 1160 (1992) (" '[a] final separation from a biological parent is a harm in itself ... Experts are increasingly concerned about the seriousness of this loss and are recognizing the need for continued contact with a biological parent, even a flawed parent ... Our courts have recognized that a child's relationship with a parent is of such significance that doubts are to be resolved against its destruction.' ") (quoting *In the Matter of the Guardianship of J.E.D.,* 217 *N.J.Super.* 1, 15–16, 524 *A.*2d 1255 (App.Div.1987)). *And see In the Matter of the Guardianship of K.L.F.,* 129 *N.J.* 32, 608 *A.*2d 1327 (1992); *J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312; *In the Matter of A.,* 277 *N.J.Super.* 454, 469–72, 649 *A.*2d 1310 (App.Div.1994). *Cf. N.J.S.A.* 30:4C–15.1(a)(3), (c) (requiring "diligent efforts" by DYFS to encourage and strengthen the parental

relationship); *N.J.S.A.* 9:6B–4(e), (f) (children in foster care enti-
tled to continued contact with biological parents and siblings under
the Child Placement Bill of Rights Act).

Thus, if a continuing relationship with the biological parent
provides a child with nurture or roots, termination may be harmful
even if someone else must assume the day-to-day care of the child.
*L.A.S., supra,* 134 *N.J.* at 140, 631 *A.*2d 928. *And see J.C., supra,*
129 *N.J.* at 18, 608 *A.*2d 1312 ("[t]o the extent that the quality of
the child's relationship with foster parents may be relevant to
termination of the natural parents' status, that relationship must
be viewed not in isolation but in a broader context that includes as
well the quality of the child's relationship with his or her natural
parents.").

In *L.A.S., supra,* for instance, the court found the record
insufficient to justify termination of the child's biological ties with
his father, a convicted murderer, who was serving a life term with
a minimum period of thirty years. There was no possibility of any
significant contact with the children for a lengthy period of time, if
ever, not to mention parental financial support. Nonetheless,
weighing the importance of the biological relationship, the Su-
preme Court concluded that the incarceration, which virtually
precluded any custodial parenting by the father, and even though
for the most serious crime of murder, did not form a sufficient
basis for termination of those rights. It was a factor, but not the
only one.

Similarly, in *J.C., supra,* the biological mother's inability to
provide a stable and permanent home resulting in foster home
placement for six years and consequent bonding with foster par-
ents, was not sufficient to justify termination of the child's biologi-
cal ties without proof of expert evidence that severance of those
ties would cause serious psychological or emotional harm to the
child, notwithstanding the trial judge's finding that the foster
parent bonding was prompted by the mother's actions, that the
child had special needs requiring stability and that there was a
strong potential for a drug relapse by the mother.

In *K.L.F., supra,* 129 *N.J.* at 32, 608 *A.*2d 1327, a homeless parent, upon the birth of her child, agreed to a temporary custody arrangement with DYFS. She visited the child twice and then went to New York City to look for permanent housing. During the following year and a half, the parent had neither work nor a home and lived in shelters and with friends. She claimed to have tried to contact DYFS by phone but was never able to reach anyone who knew about her child's case. DYFS' efforts to contact her were also unavailing. DYFS determined that the child needed a permanent home and moved her to pre-adoptive foster parents, where she continued to reside throughout the course of the litigation. Evidence was presented by DYFS that the child had bonded with her pre-adoptive parents and that to return her to her mother, whom it claimed had abandoned her, would cause her psychological and emotional harm. Nonetheless, in addition to commenting upon DYFS' lack of any real effort to locate the mother resulting in foster care placement for the first four years of K.L.F.'s life, not to mention bonding with the foster parents, the court rejected the conclusion of DYFS that the mother had, by virtue of her "abandonment" of the child, caused unremedial harm. *And see In the Matter of A., supra,* 277 *N.J.Super.* 454, 649 *A.*2d 1310; *T.C. & I.R., supra,* 251 *N.J.Super.* 419, 598 *A.*2d 899. *Contrast In the Matter of the Guardianship of J.T.,* 269 *N.J.Super.* 172, 634 *A.*2d 1361 (App.Div.1993); *In the Matter of the Guardianship of A.A.M.,* 268 *N.J.Super.* 533, 634 *A.*2d 116 (App. Div.1993); *In the Matter of the Adoption of a Child by R.K.,* 303 *N.J.Super.* 182, 198–99, 696 *A.*2d 116 (Ch.Div.1997).

The primary goal of the Child Placement Act, of course, is to obtain a permanent solution for any child placed in foster care, whether it be through reunification with the natural parent or the extended biological family, or through termination of the biological ties and adoption. *N.J.S.A.* 30:4C–53.4 to –60. *See New Jersey Div. of Youth & Family Servs. v. K.M.,* 136 *N.J.* 546, 558, 643 *A.*2d 987 (1994) ("In recognition of [the Child Placement Act's] preference for permanency for children, DYFS is required to prepare a placement plan with a goal for permanency of any child

placed in foster care for the second time. *N.J.S.A.* 30:4C–53.3. Also, the 'best interests' test under *N.J.S.A.* 30:4C–15.1 requires finding that a delay of permanent placement further harms a child."); *A.W., supra,* 103 *N.J.* at 610, 512 *A.*2d 438 (stating that permanence is important to nurturing a child); *In the Matter of the Guardianship of S.C.,* 246 *N.J.Super.* 414, 425, 587 *A.*2d 1299 (App.Div.), *certif. denied,* 126 *N.J.* 334, 598 *A.*2d 891 (1991) (finding that delay of permanent placement would "only work to [child's] detriment").

And a "stable and permanent home" is always preferable to long-term foster care. *New Jersey Division of Youth and Family Servs. v. B.G.S.,* 291 *N.J.Super.* 582, 592, 677 *A.*2d 1170 (App.Div.1996); *A.A.M., supra,* 268 *N.J.Super.* 533, 634 *A.*2d 116. But without the necessary statutory proof of each of the four-prong "best interests" tests, stability and permanency alone are not sufficient to justify termination of the child's biological ties. Moreover, the option for long-term foster care allowing for continued contacts with the child's biological family is not only not prohibited by the Legislature, but is expressly authorized. *N.J.S.A.* 30:4C–26.10 to –28; *N.J.S.A.* 30:4C–26.11(b) ("[i]f it has been determined that reuniting the child with the natural parents or placing the child for adoption will not serve a child's best interest, the child's best interest may be served through a transfer to long-term foster custody with the child's foster parent. . . .").

### III

We think it useful at this point to digress somewhat and recognize that the goal of permanency in a foster child's life is just a goal. In this respect, the following historical analysis of the "permanency movement" is of some note:

> Since the 1970s, the foster care system in this country has been guided increasingly by a philosophy of "permanency planning." Permanency planning arose as a solution to the problem of "foster care drift": children being removed from their homes, remaining in foster care for lengthy periods, losing contact with their biological parents, floating from one foster home to another, often not

receiving adequate care, and missing the opportunity to establish close bonds with any parental figure.

The permanency movement calls for preventive services coupled with periodic case review and swift planning to secure a permanent home once a child enters foster care. Its advocates emphasize the importance of providing families in crisis with preventive services to keep the child from entering foster care at all. Once the child is placed in foster care, however, the goal of "permanency planning" shifts to getting the child out of foster care as soon as possible, preferably by returning her to the parent, but if that is not possible, by terminating parental rights in order to free her for adoption.

At the heart of the permanency planning concept lies the notion of the "psychological parent" as developed in the collaborative works of Joseph Goldstein, Anna Freud, and Albert Solnit. The guiding principle of this tremendously influential theory is to honor the child's different sense of time and need for continuity. Basing their conclusions on psychoanalytic theory and clinical observation, Goldstein, Freud, and Solnit argued that a child's normal psychological development depends on a secure, uninterrupted relationship with one caregiver—the "psychological parent." They further argued that children have "an intense sensitivity to the length of separations" and that even brief separation can have profoundly damaging effects on the child. Applying these principles, Goldstein, Freud, and Solnit launched a scathing critique of the laws governing foster care in their 1973 book, *Beyond the Best Interests of the Child*. Foster care, they argued, because of its impermanent nature, had little likelihood of promoting the child's emotional well-being. Thus, they advocated a legal overhaul of the foster care system that would "minimize disruptions of continuing relationships between a psychological parent and the child" and provide for rapid adjudication of disputes.

In the 1970s, state laws began incorporating these permanency principles based on the concept of the psychological parent. Moreover, major reform occurred at the federal level in 1980 with the passage of the Adoption Assistance and Child Welfare Act (Child Welfare Act), which remains the federal law governing foster care today. Its purpose was "to lessen the emphasis on foster care placement and to encourage greater efforts to find permanent homes for children either by making it possible for them to return to their own families or by placing them in adoptive homes." To qualify for federal funding, the Child Welfare Act requires that states demonstrate they have made "reasonable efforts" at preventing the removal of the child from the home and reunifying the family once the child has been removed. The Act also requires that the state child welfare agency develop a case plan for each child under its care and that there be periodic case reviews by a court or by administrative review.

An increased focus on the termination of parental rights accompanied the rise of the permanency planning movement. Maas and Engler's pathbreaking 1959 treatise on foster care drift, *Children in Need of Parents*, articulated termination as an important tool for creating permanency and then called for enactment of state legislation governing the termination of parental rights, little of which existed at the time. By the late 1970s, children's advocates were forcefully lobbying for the reworking of state termination statutes based on permanency principles.

Academics published articles pressing for legislative reform. The Children's Defense Fund and the Child Welfare League of America issued detailed guidelines for state TPR legislation. By 1981, at least nine different model acts on termination of parental rights had been drafted by various organizations, including the American Bar Association, the United States Department of Health and Human Services, and the National Council of Juvenile Court Judges. Today every state and the District of Columbia have enacted detailed TPR legislation.

The emphasis on speedily achieving permanency for children, whether by return to the biological parent or by termination, was a dominant theme in these groups' proposals. The concern with speed was premised both on psychological parent theories regarding the child's sense of time and need for continuity and on studies that suggested that a child's chances of achieving a permanent home dramatically decreased after the first year in placement.

[Jennifer Ayres Hand, *Preventing Undue Termination: A Critical Evaluation of the Length–of–Time–Out–of–Custody Ground for Termination of Parental Rights,* 71 *N.Y.U. L.Rev.* 1251, 1256–1260 (1996) (footnotes omitted).]

In the same article, the author pointed out that "a central critique" of the goal of permanency which often fosters a favoring of termination of parental rights

... suggests that termination practices are imbedded with institutional racism and classism and characterizes the permanency movement as an attempt to "rescue" children from their poor or minority parents. Critics point to the fact that most children placed in foster care are poor, nonwhite, and often lack the resources on which wealthier families rely during times of crisis, thus forcing them to rely on the dependency system. These critics further charge that the termination process often fails to acknowledge strong kinship networks prominent in the family structures of people of color and frequently overlooks kin groups as resources or placement alternatives. As a result, children may be removed—against their best interests—from the kin to whom they are deeply attached and who have served as their primary caretakers.

In a similar vein, an often repeated critique of termination of parental rights as conceived by the permanency movement is that its foundational principle, the "psychological parent," is misconceived. Critics have not only attacked Goldstein, Freud, and Solnit's research methods, but also have argued that their theory focuses too much on the "exclusivity" of the parent-child relationship without regard for the child's ability to form multiple attachments. Critics argue that current termination policy is too quick to overlook long-term placement options other than the termination-adoption route. They note that ending foster care is not the only means of achieving stability for the child. Guardianship and long-term foster care, for instance, are options in which the child remains within the system under the care of an adult other than the biological parent, but the parent's rights are not terminated, and the possibility of parental contact remains open.

Thus, the role of termination of parental rights in general has come under significant attack in recent years.

[*Id.* at 1267–1269 (footnotes omitted).]

The view reflected by these articles that the concept of "permanency" and oft times corresponding perceived need to sever parental ties perhaps should be approached with more caution than initially posited, takes its lead from a recognition of the harm to a child in severing his or her biological ties. For instance, in a recent article that echoes prior observations, it was asserted:

The focus of Goldstein, Freud, and Solnit on a single "psychological parent" attachment apparently stems from a concern for protecting children from the conflicts of competing parental claims. They note that loyalty conflict is likely to arise when children maintain relationships with parental figures who do not have an amicable relationship with one another. However, they fail to note that being denied a relationship with a parent of origin is also likely to cause loyalty conflict, precipitate distress due to loss, and bring on anxiety and fear of being banished in a manner similar to the lost parental figure.

Children in foster care and adoption suffer further psychological damage as a result of being cut-off from their family of origin or prior foster family. A child may be precipitously denied contact with the family of origin if that child becomes distressed following a parental visit. A child's symptoms, however, may be the result of a number of causes, including inappropriate behavior on the part of the visiting parental figure, the foster parent's anxiety about the visit, a sense of loss in the child activated by contact with the noncustodial parent, or the child's feelings of guilt about being disloyal to one or another of the parental figures. Interpreted through the "psychological parent" theory lens, however, distress following a visit with a parent is easily and summarily explained as the inevitable result of the child's successful relationship with its "psychological parent." In fact, these situations warrant sensitive clinical evaluation, interpretation, and treatment, rather than further separation from the family of origin and more loss.

Indeed, *several empirical studies indicate beneficial effects resulting from children maintaining contact and visits with their family of origin during placement. Cutting the child off from parents can lead the child to have misconceptions of the parent resulting in a disruptive psychological impact on the child. Absent parents can be idolized and thus become a barrier to the child forming an intimate relationship with parental surrogates. Alternatively, absent parents can be denigrated in the child's mind, which may have a negative impact on the child's own self-esteem and self-conception.*

The Goldstein, Freud, and Solnit "psychological parent" theory is also deficient in its lack of a developmental focus. It seems to suggest that children can be transplanted from one family setting to another, where past relationships are out of sight, out of mind. Although infants evidence no interest in biological ties and warmly respond to present caretakers, this should not be taken as an indication that ties to the family of origin will have no meaning to these infants as they grow and develop. Children develop relationships rather indiscriminately with adults who are responsive to them, whether the adult caretakers are adequate, inadequate, or abusive. Yet, *there are special psychological connections that children*

have with their parents of origin, regardless of whether the parents of origin are absent or present. The family of origin is a source of identity for the child—the child may resemble the parents of origin and may share personality traits or even health problems with them. No other love will substitute for that which the child imagines would be bestowed by the parent of origin. These ideas and feelings typically do not emerge until preadolescence, and can take on a dramatic form in adolescence. It is during the ages of six through eighteen that adopted children are likely to become troubled by the adoption, grieve the loss of the family of origin, and may exhibit psychological, behavioral, and academic problems.

[Matthew B. Johnson, *Examining Risks to Children in the Contest of Parental Rights Termination Proceedings*, 22 *N.Y.U. Rev. L. & Soc. Change* 397, 407–09 (1996) (emphasis added) (footnotes omitted).]

*See* Marsha Garrison, *Parents' Rights vs. Children's Interests: The Case of the Foster Child*, 22 *N.Y.U. Rev. L. & Soc. Change* 371 (1996); Candace M. Zierdt, *Make New Parents But Keep the Old*, 69 *N.D. L.Rev.* 497 (1993); Margaret Beyer & Wallace J. Mlyniec, *Lifelines to Biological Parents: Their Effect on Termination of Parental Rights and Permanence*, 20 *Fam. L.Q.* 233 (1986); Theresa A. Nitti, *Stepping Back from the Psychological Parenting Theory: A Comment on In re J.C.*, 46 *Rutgers L.Rev.* 1003 (1994); Carol Amadio & Stuart L. Deutsch, *Open Adoption: Allowing Adopted Children to 'Stay in Touch' with Blood Relatives*, 22 *J. Fam. L.* 59 (1983). *And see J.C., supra,* 129 *N.J.* at 19–22, 608 *A.*2d 1312; *T.C. & I.R., supra,* 251 *N.J.Super.* at 439–40, 598 *A.*2d 899.

At least one commentator has characterized the Supreme Court in *J.C., supra,* 129 *N.J.* at 26, 608 *A.*2d 1312, as having "hinted at a possible solution to the problems inherent in the foster care system when it discussed the possibility of departing from traditional adoption procedure by allowing the biological mother to retain visitation rights even if her daughters are adopted by their foster parents." Nitti, *supra,* 46 *Rutgers L.Rev.* at 1035. *See In the Matter of the Guardianship of R.O.M.C. and S.A.S.C.,* 243 *N.J.Super.* 631, 634, 581 *A.*2d 113 (App.Div.1990) ("[i]f there is a problem at some time in the future with the natural mother's effecting visitation [post-adoption] on a consensual basis, then the natural mother could apply to DYFS for an investigation, and the court exercising its common-law powers, might direct that visita-

tion be permitted, but only if the circumstances as they then exist show that such contact is in the best interests of the children."); *Kattermann v. DiPiazza*, 151 *N.J.Super.* 209, 376 *A.*2d 955 (App. Div.1977) (permitting biological mother visitation rights with child adopted by maternal grandparents). *But see In the Matter of the Adoption of a Child by D.M.H.*, 135 *N.J.* 473, 494, 641 *A.*2d 235, *cert. denied sub nom. Hollingshead v. Hoxworth*, 513 *U.S.* 967, 115 *S.Ct.* 433, 130 *L. Ed.*2d 345 (1994); *N.J.S.A.* 9:3–50(c).

The same commentator addressed the concept of "open adoption," sometimes referred to as a "weak adoption," that is adoption with continued contact with the biological family, asserting:

Traditional adoption requires that parental rights be terminated. Traditional adoption does not guarantee emotional health for the child. Emotional injuries suffered by a child in the events leading to termination of his biological parents' rights and the child's adoption cannot be healed by the adoption itself. A biological parent may remain a significant figure to an adopted child. The psychological parenting theory has been criticized for ignoring the child's "profound need" to know about her biological parents. Clearly, traditional adoption does not allow the child to start her emotional life anew.

Granting the biological parent visitation rights after her child is adopted by others is referred to as open adoption. Open adoption is seen by proponents as valuable in reducing the trauma to the child of the legal process, as well as sustaining biological family relationships. Foster care research indicates that continued contact with a biological parent is beneficial to the child's emotional health. Open adoption is also appealing because nobody loses: the child receives the benefit of foster parents better equipped to raise him and also retains a relationship with biological parents to whom he is still attached; the foster parents get to raise the child they have grown to love; and the biological parents are not severed from a relationship with their child.

*The reality of modern families departs from the model provided for by the courts, that of one parent of each sex. Many children are multi-parented. For example, children of divorce with one or both parents remarried will have stepparents. Depending on the circumstances of custody and visitation, these children will be raised by more than two parental figures and will form relationships with all of them. Studies have been conducted on working-class and "underclass" black communities which examine the nontraditional "kinship" group that shares child-rearing responsibilities. Additionally, many children of intact families have full-time caretakers other than a biological parent, as in the case where both parents hold jobs. It is time for the courts to recognize a new definition of parenthood that corresponds with the realities of modern life. As one commentator has noted, when rules are not made for the child's best interests, it is at the expense of the child whose reality does not fit the reality provided for by the courts.*

[Nitti, *supra*, 46 *Rutgers L.Rev.* at 1035–1037 (emphasis added) (footnotes omitted).]

■ The concept of open adoption, it seems, is not a viable legal alternative in New Jersey to the traditional severance of parental rights. *D.M.H., supra*, 135 *N.J.* at 491, 641 *A.*2d 235; *B.G.S., supra*, 291 *N.J.Super.* at 595–97, 677 *A.*2d 1170. *But see D.M.H.*, 135 *N.J.* at 494, 641 *A.*2d 235. And to be sure, while it has some benefits, adoption with continuing biological ties has both philosophical and practical drawbacks, not to mention lack of express statutory authority. *Ibid.* at 493, 641 *A.*2d 235; *B.G.S., supra*, 291 *N.J.Super.* at 597, 677 *A.*2d 1170. As expressed in one article:

What are some of the major drawbacks to this suggestion [open adoption]? Several leap to mind. The first concern is that potential adoptive parents often may not be willing to adopt children under these types of circumstances because it may intensify any feelings of insecurity they have about the adoption process. Adoptive parents may worry about their entitlement to have and control the adopted child. They may fear that the birthparents will try to disrupt the placement. However, with the adoption of children who have been through the foster care system, it seems that there is a much slighter chance that a birthparent would try to disrupt the placement. The birthparent would know that most of her parental rights had been terminated already and that she only retained visitation rights as long as it was in the child's best interests.

Another criticism is that this type of situation may only confuse the adopted child so that she will not be able to deal with the differing value systems among multiple parents and any resulting loyalty conflicts. Several courts have assumed that allowing visitation between birthparents and an adopted child would only cause great confusion for the child. However, there seems to be general agreement that if the relationship between birthparents and adoptive parents is clear and positive then the child will be least confused about loyalties.

One other possible criticism is that this option will deplete more judicial resources because it gives a birthparent a statutory right to court enforced visitation—something she would not normally have after the termination of her parental rights.

[Zierdt, *supra*, 69 *N.D. L.Rev.* at 512–513 (footnotes omitted).]

But still, the alternative of long-term foster care with continued contact with the biological family remains a viable option and may, in appropriate, albeit limited, circumstances, satisfy the potentially harmful consequences of an outright severance of biological ties yet without the negative drawbacks foreseen in an "open adoption" setting.[3]

---

[3] We note in this respect the rejection of long-term foster care in *B.G.S., supra*, 291 *N.J.Super.* at 592, 677 *A.*2d 1170, and the reliance in *B.G.S.* upon *N.J.S.A.*

## IV

■ It is, however, the trial judge's application of the "best-interests" four-prong test of *N.J.S.A.* 30:4C–15.1(a) that we must consider. In his March 17, 1997 oral opinion, the trial judge said:

> The first prong or stipulation has to be whether the child, [K.O.'s], development would be endangered by the parental relationship. That is, in some instances, the most troublesome, a case where there is no direct physical assault. No one claims that [B.S.] battered the child within the definitions of our understanding of such conduct, but the case of *Division of Youth and Family v. B.G.S.*, at 291 *N.J.Super.* 582, 677 *A.*2d 1170, beginning at 591, 677 *A.*2d 1170, presents to us, most recently, our Appellate Court pointing out what the definitions are regarding that.
>
> *Where a child is in a foster home and is in such a position in that home,* which the evidence reflects in P–2 and P–3, *such that there is a strong or stronger bonding relationship to foster parents, which if it were severed,* or removed, or tampered with, could cause, or would cause, profound harm. The experts in another case referred to in *B.G.S.* at 592, 677 *A.*2d 1170 indicate that this *is considered to be a serious, long-term psychological harm* if there were such a removal from the foster placement.
>
> Further, that serious emotional injury or developmental delay satisfies such a prong. *There is not here a proof of developmental delay, but the initial harm caused by the drug pregnancy that [B.S.], unfortunately, visited upon [K.O.], is a failure to care for her and to protect her, and is within the definition, if not of abuse, certainly of neglect within the concerns of development and health endangerment.* And that case supports this Court's belief that the prong here has been satisfied in that regard. The elements are apparent and real.
>
> The second prong, if you will, in that statutory definition is that the parent is unable, and I'm selecting the words carefully, to eliminate the harm or to provide a safe and stable home for the child and delay of permanent planning will add—or only add to the harm.

30:4C–53.4, 30:4C–60 and 30:4C–53.1(d), which "effectuate the legislative policy that children be placed in 'stable and permanent homes' instead of long-term foster care." *N.J.S.A.* 30:4C–53.4, 30:4C–60 and 30:4C–53.1(d) are part of the Child Placement Review Act and are triggered by "repeated placements" as defined in *N.J.S.A.* 30:4C–53.2. This case does not involve "repeated placements." We also note the recent Congressional enactment of the Adoption and Safe Families Act of 1997, Pub.L. No. 105–89, 111 Stat. 2115 (amending various sections of the Social Security Act, 42 *U.S.C.A.* §§ 301 to 1397jj), which seems to place a greater degree of emphasis upon permanency by imposing reduced time limits, under certain circumstances, upon the duration of foster care and the timely freeing of foster care children for adoption. Neither party has raised or addressed this new legislation or the impact it may have upon our present statutes, including the long-term foster care act. We do no more, then, than to note its enactment.

It goes on to say such harm may include evidence that separating the child from its foster parents would cause serious and enduring emotional harm to the child.

The Legislature has talked about, and it's in *B.G.S.*, so I won't repeat it, the *policy of our State Legislature that a child be in a stable and permanent home, instead of indefinite, long-term foster care. And this record would indicate that [K.O.] is entitled to that stability and relief from any anxiety which might be attached to a lack of permanency.*

As to the third prong, has the Division been diligent in its efforts? By an absence of any criticism, the Court will not recite at length the efforts made by the Division to seek out responsible persons beyond the birth parents, [D.O. and B.S.], but they are either, by reason of age, or other obligations, overwhelmed themselves.

[B.S.'s] mother is caring for her other son, an older child, and thus, for example, is unable to be of assistance in regard to taking on the responsibilities for [K.O.].

But the Division did do what they were supposed to do, and that is to seek out alternatives to foster care early on and even within the past period of one year. No one else has been turned up, and so we turn to the fourth prong, and that is the affect of termination.

And the classic language is that would it do—or would it not do more harm than good in the classic way it was written? The Division does have a permanent plan, that permanent plan is for the current foster parents, who are desirous and have cared for [K.O.], to become the new parent, if you will, and I can use that term as they have evidenced their interest to that degree.

The law guardian's examination of the home is independent corroboration that this is a healthy atmosphere.

*The issue then comes back to has, or does [B.S.] demonstrate the capacity to be a mother for [K.O.], her birth child,* and the Court will not repeat what was argued by any counsel, but it must simply agree with the nostrum that was presented and said in the most considerate way, for the record, that the old saying that the road to heaven is paved with good intentions seems to fit in this situation.

Here *is a child who is aware and is apparently bright, who knows B.S. as her other parent,* if you will. But she has two parents, and that's very nice, and very good. And if, in the future, it is handled properly, it will go well for the child.

But [B.S.], as Dr. Korost (sic) has stated in his most recent evaluation, perpetuated a behavioral pattern, which compels a result I'll get to shortly. It is important to note the question of time and the plea made by the birth mother, I just need more time.

Not everyone has the opportunity, some say they should have the right for independent representation for the period that the Court makes reference to the abuse/neglect docket where there was a strong effort made to attract and make [B.S.] recognize her obligations, but the chance was there and was provided. *The chance to become the parent that she wishes to be, but she hasn't been that parent. In a sense, she is a visitor by biology alone and, of course, she will always be the birth parent.*

[Emphasis added.]

Our concerns here focus primarily upon the first and fourth prongs of the test, though we are somewhat uncomfortable with the third prong, that is the diligent efforts of DYFS. We say that because part of DYFS' efforts must focus upon the availability of an extended biological family member to provide custodial care of the child. In this respect, both B.S. and her mother provided DYFS with, in addition to that of a close family friend, the names of several family members they said were interested in assuming the care of K.O. To be sure, the information provided in some instances as to addresses and telephone numbers was insufficient to give DYFS a direct lead to the relatives, but as far as we can tell DYFS did nothing on its own to ferret out available family members. And we do not quite understand the basis for the rejection of the close family friend who apparently expressed an interest in providing custodial care for the child, since clearly being on welfare is not an adequate basis for such rejection.

But be that as it may, we are convinced the record does not, at this stage at least, support clearly and convincingly the trial judge's finding on the first prong of the test that K.O.'s health and development has or will be endangered by the continuation of her relationship with B.S. Perhaps more troublesome, nowhere in his opinion can we find any consideration of the fourth prong, that is that termination of the biological ties will not do more harm than good.

To begin with, we ask ourselves on what basis the trial judge found, at least clearly and convincingly, that B.S. has endangered K.O.'s health and development and that continuation of the parental relationship will so endanger, when DYFS' own expert has opined that continuation of both K.O.'s relationship with her bonded foster parents *and* with B.S. would be in her best interests.[4] That this opinion has a valid basis is reflected in the

---

[4] To be sure, Dr. Chorost's March 13, 1997 fax might appear to express a different conclusion. But it has no supporting rationale and, quite frankly, is

caseworkers' consistent reports entered after each visit with K.O. that reflect not only a warm and caring relationship on the part of B.S., but as well on the part of K.O. We note, further, that many of the visits included visits with K.O.'s biological brother J.S., and that K.O.'s relationship with him, such as allowed by DYFS, seems as well to have been quite positive. Moreover, in the context of B.S. having detrimentally caused harm to K.O., we ask ourselves why J.S., with whom she has had much more contact, is not also, as far as we can discern, thought to be at similar risk.

It serves us well to remember that not every injury satisfies the first prong of the "best interests" test. A showing of physical abuse, or serious emotional injury, or developmental retardation is required. *A.W., supra,* 103 *N.J.* at 605, 512 *A.2d* 438. The court's focus should be on harm for which there is " 'unambiguous and universal social condemnation.' " *Id.* at 604, 512 *A.2d* 438 (quoting *Developments in the Law—The Constitution and the Family,* 93 *Harv. L.Rev.* 1156, 1319 (1980)). The trial judge concluded that B.S.'s drug addiction and corresponding inability to provide a stable home satisfied this prong. He concluded such conduct was the equivalent to statutory "abuse" or "neglect." *See K.M., supra,* 136 *N.J.* at 556, 643 *A.2d* 987. As defined in Title 9 and pertinent hereto, however, an abused or neglected child includes one whose parent:

> (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; ... (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of

inconsistent with the overall tenor of his official written report. Without, at the least, his testimony during the trial, we can perceive of no reason why the fax should take precedence over the report.

excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court. . . .

[136 *N.J.* at 555–56 (quoting *N.J.S.A.* 9:6–8.21).]

B.S. has never been adjudicated "unfit" within the meaning of Title 9, indeed, the circumstances are simply not such that the statutory standard could not be met. That is why DYFS proceeded under the "best interests" provision of *N.J.S.A.* 30:4C–15.1(a). *And see generally A.W., supra,* 103 *N.J.* 591, 607 n. 8, 512 *A.*2d 438.

To the extent the trial judge may have thought B.S., through her inability to overcome her drug addiction and provide a stable home, abandoned K.O., such finding requires proof that a parent, who was physically and financially able to care for his or her children, voluntarily and purposely acted in a way indicating a willful relinquishment of parental rights and duties. *J.C., supra,* 129 *N.J.* at 17, 608 *A.*2d 1312; *N.J.S.A.* 30:4C–15.1(b); *N.J.S.A.* 9:6–8.21(c)(5). *But see In the Matter of Adoption of a Child by F.O. and W.O.,* 307 *N.J.Super.* 176, 704 *A.*2d 604 (Ch.Div.1997); *Matter of Adoption of a Child by R.K., supra,* 303 *N.J.Super.* 182, 696 *A.*2d 116; *N.J.S.A.* 9:3–48(c)(1). The biological parent " 'must have engaged in a course of conduct that evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child.' " *D.M.H., supra,* 135 *N.J.* at 481, 641 *A.*2d 235 (quoting *In re Adoption of Children by L.A.S., supra,* 134 *N.J.* at 135, 631 *A.*2d 928). Clearly that could not be shown here. B.S. had and has no intent to abandon K.O. She simply does not have the wherewithal, physically or mentally, to kick her drug habit. Yet she loves her child and, unrestrained by the inevitable adverse influences of a foster parental setting, so would her child.

The difficulty is that the record that is presently before us does not provide any reasonable basis for concluding that B.S. will ever be able to provide a sufficiently stable home environment to permit reunification. But on the other hand, neither does it demonstrate clearly and convincingly that terminating K.O.'s relationship with her biological family will not harm her, either presently, or perhaps more critically, in the long run. She is now

only four years old. When she is a teenager or young adult, will she ask, was I abandoned by my Mom? What was wrong with me? Why did my biological mother reject me? There may well be an answer to these questions. There may well be a scientific response that even if unanswerable, the positive effects of adoption now outweigh these potential concerns. But we cannot tell from the record presented to us. Indeed, the trial judge simply did not address the fourth prong of the "best interests" test and, thus, this issue.

The trial judge placed much reliance on *B.G.S., supra,* 291 *N.J.Super.* 582, 677 *A.*2d 1170. Facially, the facts in that case seem similar in that the biological mother was a drug addict unable to rehabilitate herself, yet had evidenced and maintained a loving and caring relationship with her child who had been in foster care for an extended time. But the record there was quite distinct, containing both physical and sexual abuse to the child during the short period of time he was in the mother's custodial care. More critically, the record presented to the trial judge in *B.G.S.* contained substantial expert evidence to establish all prongs of the statutory test, including the first and fourth prongs. To put it mildly, such a record does not exist here.

To the extent the trial judge referred to and relied upon the record in *B.G.S.,* we say only that each case presents its own unique facts and requires its own unique record. Children and their relationships, biological or otherwise, are unique. If DYFS is to terminate such relationships, it must establish the basis to do so in each case. It has not done so here.

### V

We would not be honest were we not to acknowledge our sense that B.S. may never be able to overcome her drug habit, but yet still be able to provide an emotionally positive relationship with K.O., albeit noncustodial. We do not know whether continuation of the "status quo" to preserve K.O.'s continuing ties with not only B.S., but her extended biological family, particularly her grand-

mother and natural brother, is the appropriate solution, albeit not entirely "permanent." And there is no doubt that the foster parents have provided K.O. with a positive and nurturing environment during her critical early years in life. She obviously is deeply attached to them, as well as to her foster family siblings— as are they to her. We are neither blind nor unfeeling to that. But we do not sense that if adoption is not a viable alternative, K.O.'s foster family will disappear. Indeed, the record reflects that these parents have other foster children, as well as their own biological children, and did not, at the outset, look to K.O. as an adoptive child. That is to say, that is not why they agreed to provide a foster home for her. We doubt that their feelings for her will change because something short of adoption is the ultimate answer. In the end, Dr. Chorost's initial opinion that both biological and foster ties should continue to be encouraged may well be the least harmful of all the alternatives here.

We see no reason why visitations with B.S. should not resume and why they should not occur in O.S.'s home, where J.S., K.O.'s biological brother, lives. Moreover, DYFS should more affirmatively investigate available family members for placement, as well as the close family friend who had expressed such interest but was seemingly rejected because she was on welfare. If it intends to continue with its termination complaint, DYFS should present expert evidence evaluating and weighing K.O.'s biological ties and the impact of their termination upon her, both now and in the future, as well as K.O.'s foster family ties and the impact of their termination also. The foster parents' ability and willingness to continue positively in K.O.'s life without the hope of adoption should also be considered and weighed. Additionally, B.S.'s progress, or lack thereof, in overcoming her drug problem and her ability to provide a stable environment should also be reassessed. If DYFS continues to be unsuccessful in locating a suitable family or close family friend for placement, it should present evidence of its efforts in that respect so that an analysis of the required "due diligence" can be made. Moreover, if the situation remains that K.O.'s ties with her biological family, albeit perhaps suspended

during the interim of this appeal, are, overall, positive (putting aside B.S.'s inability to provide a custodial home), but that K.O.'s relationship with her foster family also remains positive, expert evidence should be provided that forms a basis for the trial judge to cogently consider the viability of long-term foster care with continuing biological family visitations as an appropriate alternative to termination and adoption on the one hand, and reunification on the other hand. We understand that this might be most costly and taxing on the resources of DYFS, but it may be the one solution that meets the best interests of K.O. and it is one that is presently within the permissible solutions established by the Legislature.

We thus reverse the termination of B.S.'s parental ties. We remand for such further proceedings as may be appropriate, consistent with this opinion. Should DYFS determine to continue pursuing termination, we leave it to the trial judge to fashion an appropriate schedule for discovery relating to the additional evidence DYFS must present and any evidence B.S. and the law guardian may choose to present. In the interim, as we have said, visitations with K.O.'s biological family should resume and we see no reason why said visits cannot recommence in the maternal grandmother's home. If, as we suspect, they have ceased, the visitations may have to be resumed gradually and we leave it to the trial judge to so determine. We do not retain jurisdiction.