723 A.2d 1000

IN THE MATTER OF THE GUARDIANSHIP OF
A.R.G., M.A.G., C.M.G., E.D.G., AND J.N.G.

Superior Court of New Jersey
Appellate Division

Submitted January 26, 1999—Decided February 19, 1999.

Before Judges LONG, KESTIN and CARCHMAN.

*David H. Dugan, III*, attorney for appellant.

*Peter Verniero*, Attorney General, attorney for respondent New Jersey Division of Youth and Family Services (*Mary C. Jacobson*, Assistant Attorney General, of counsel; *Debra Hope Masser*, Deputy Attorney General, on the brief).

No brief was filed by any other party.

The opinion of the court was delivered by

CARCHMAN, J.A.D.

Defendant L.M.G. appeals from a judgment of the Family Part terminating her parental rights to four of her children, M.A.G., C.M.G., E.D.G. and J.N.G.[1] We affirm.

---

[1] A fifth child, A.R.G., was originally named in the complaint but was subsequently removed from the case and consideration by the court.

The facts describe circumstances which unfortunately are not atypical. Defendant was involved with drugs and a victim of an abusive relationship with her husband. During the infant years of the children, defendant was using crack cocaine. Despite some progress away from addiction, defendant's drug evaluation suggested more denial than true recovery.

The Division of Youth and Family Services (DYFS) first became involved in defendant's case on January 8, 1993, when informed by the Children's Hospital of Philadelphia that defendant had delivered twins, not subject to this proceeding, prematurely due to her cocaine abuse. Over the next six months, DYFS documented numerous instances of abuse and neglect of the children while defendant remained unreceptive to rehabilitation efforts. Finally, on June 1, 1993, a neighbor reported to DYFS that defendant regularly hit the children and left them unattended for extended periods of time.

DYFS obtained custody of the children on June 7, 1993, after the Burlington Police informed DYFS that the children were again left unattended. According to defendant's DYFS caseworker, the children were hungry and dirty. The children were eventually placed in foster care, and, despite several search attempts, DYFS remained unaware of defendant's location for the next two years; defendant occasionally contacted DYFS but refused to indicate her whereabouts.[2]

Also on June 7, 1993, defendant was admitted to the Rancocas Hospital and diagnosed with major recurrent depression, cocaine abuse, chronic alcoholism and pharyngitis. While her condition was improving with medical care, she eloped from the unit eleven days later.

Within a few months of DYFS's involvement with the children, it received information regarding sexual abuse of the children.

---

[2] The caseworker indicated that she successfully located defendant once in 1995 after reading in the newspaper that defendant had been arrested at a certain address.

Further investigation revealed that A.R.G., the children's older sibling, had sexually abused one of the children, and a former foster mother's nephew abused two of the other children. Finally, the children had been exposed to their mother engaging in sexual relations with men.

The children's lives with their mother were self-described as ones filled with drug use, sexual activity and domestic violence. One of the children described being forced to steal money from her mother to buy food as defendant would otherwise spend the money on drugs.

Dr. Ronald S. Gruen conducted comprehensive psychological and bonding evaluations and a psychological assessment of the parties. Dr. Gruen determined that defendant was "indifferen[t] to the psychological suffering of her children," and consistently "minimized the damages to the children as a result of her history of drug and alcohol abuse." He added that she is very narcissistic, meaning she is her own central concern while "the children are kind of peripheral." Furthermore, Dr. Gruen noted that her "addiction potential is great and her current remission is relatively short-term." Also, while he found no strong bonding between defendant and the children, Dr. Gruen observed a "positive and developing psychological bond between the children and the foster parents." Dr. Gruen concluded that the children were thriving with the foster parents, and removing them would create enduring harm. Therefore, he recommended that the children's long-term best interests would be served by terminating defendant's parental rights and allowing foster-parent adoption. Dr. Gruen also advised DYFS that visitation between defendant and the children was not in the children's best interests.

Defendant's expert, Dr. Kenneth Goldberg, found that the children bonded to defendant, but that she "may be limited in addressing the children's needs separate from her own need to assuage her guilt." Therefore, while Dr. Goldberg agreed that the children should remain with the foster parents and that serious and enduring harm would occur if they were moved, he also

argued that permanently severing L.M.G's parental rights would be harmful. Dr. Goldberg concluded both that the children should not be returned to defendant and that her parental rights should not be terminated. Therefore, after acknowledging that it was difficult to reconcile his opinion with current law and public policy, he recommended continuing and increasing visitation between defendant and the children and deferring the possibility of reunification until later evaluations are made.

An addendum that Dr. Goldberg provided to his initial report after conducting a bonding evaluation of the children and the foster parents significantly altered his opinion:

> In my opinion, the foster parents are highly bonded to the ... children, they are motivated by legitimate and loving parental concerns, and are capable of meeting the children's physical, personal, educational and psychological needs. The children are bonded to them, have gained enormously from placement in this foster home, and would be harmed if they could not continue the relationship they have with the foster parents. *Consequently, it is my opinion that the children would thrive if adopted by the foster parents.*
>
> Obviously, this statement contradicts the position I took prior to this addendum. It certainly is not intended to contradict the observations I made, that there is bonding to the mother, and that the children may need some form of contact with her in the future. However, the quality of the foster family is so impressive (in comparison to foster family's [sic] I have seen in other cases), that it would be foolhearty [sic] not to support the foster parents in their efforts to offer the children a stable and permanent environment. [Emphasis added.]

Judge Smith granted DYFS guardianship and terminated defendant's parental rights. While he found that defendant's lack of contact with the children did not constitute abandonment, *N.J.S.A.* 30:4C–15(d), he concluded that the best interests of the children required guardianship, *N.J.S.A.* 30:4C–15(c). He analyzed the factors set forth in *N.J.S.A.* 30:4C–15.1a and determined that the State had established the factors by clear and convincing evidence.[3] *See New Jersey Div. of Youth and Family Servs. v. A.W.,* 103 *N.J.* 591, 604–05, 512 *A.*2d 438 (1986).

---

[3] The four elements required by *N.J.S.A.* 30:4C–15.1a are:

> (1) The child's health and development have been or will continue to be endangered by the parental relationship;

On appeal, defendant asserts that DYFS failed to establish the statutory factors by clear and convincing evidence. Additionally, relying on our decision in *In re Guardianship of K.H.O.*, 308 *N.J.Super.* 432, 706 *A.*2d 226 (App.Div.), *certif. granted*, 156 *N.J.* 405, 719 *A.*2d 637 (1998), defendant argues that the trial judge failed to consider the additional option of long-term foster care combined with continuing visitation. We have carefully reviewed the extensive record and considered defendant's arguments, and while we conclude that they are without merit, *R.* 2:11–3(e)(1)(E), additional comment is warranted regarding the applicability of *K.H.O.*

Subsequent to the trial judge's decision in this case terminating defendant's parental rights, we decided *K.H.O.* and noted that "the alternative of long-term foster care with continued contact with the biological family remains a viable option and may, *in appropriate, albeit limited, circumstances,* satisfy the potentially harmful consequences of outright severance of biological ties." *K.H.O., supra,* 308 *N.J.Super.* at 450, 706 *A.*2d 226 (emphasis added). While the defendant's circumstances and those of the mother in *K.H.O.* may appear to be similar, the cases are substantially different.

In *K.H.O.,* the biological mother, B.S., abused drugs and agreed to place her child, K.H.O., in temporary foster care. K.H.O. remained with the foster parents, bonded with them and thrived under their care. Nevertheless, B.S. maintained visitation, although the record was unclear to what extent, and K.H.O. estab-

---

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents will cause serious and enduring emotional or psychological harm to the child;

(3) The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

lished a good relationship with B.S. Further, the State's expert provided an initial report stating that, while B.S. was not yet ready for reunification, K.H.O. would benefit from continued and increased contact with her. Only four days before the hearing, however, and without a justifiable change in circumstances, the expert reversed his opinion and recommended termination of B.S.'s rights. He did not testify at the hearing to explain his reversal. After a hearing at which only the DYFS caseworker testified, the trial court terminated B.S.'s parental rights.

On appeal, we reversed the trial court's termination of B.S.'s parental rights. Although we acknowledged that long-term foster care provided an option, we, nevertheless, stated that our review was primarily concerned with the trial court's analysis of the four prongs of *N.J.S.A.* 30:4C–15.1. We concluded that the inadequate record did not clearly and convincingly support the trial judge's findings and reversed the trial court because DYFS failed to sufficiently establish the four prongs. We instructed DYFS that, should it attempt to pursue termination further, it should present competent expert testimony evaluating K.H.O.'s ties with her biological and foster families as well as the potential impact of breaking those bonds. Again as to the "third option," we acknowledged that "[w]e do not know whether continuation of the 'status quo' ... is the appropriate solution, albeit not entirely 'permanent.'" *Id.* at 456–57, 706 *A.*2d 226. Rather, should K.H.O.'s ties with both her biological and foster parents remain positive, "expert evidence should be provided that forms a basis for the trial judge to cogently consider the viability of long-term foster care with continuing biological family visitations as an appropriate alternative to termination and adoption on the one hand, and reunification on the other." *Id.* at 458, 706 *A.*2d 226.

Here, unlike in *K.H.O.*, the record was sufficiently developed so as to enable Judge Smith to evaluate the children's case under the statutory factors. Both the State and L.M.G. presented experts who conducted psychological and bonding evaluations of the children, L.M.G. and the foster parents. Both experts also recom-

mended against reunification at this time. Just as suggested in *K.H.O.*, L.M.G.'s expert, Dr. Goldberg, presented Judge Smith with his opinion favoring a foster parent adoption with visitation. The record clearly supported Judge Smith's conclusion that termination and adoption would be in the children's best interests. Such conclusion was based on substantial credible evidence in the record. *Cesare v. Cesare,* 154 *N.J.* 394, 411, 713 *A.*2d 390 (1998); *Rova Farms Resort, Inc. v. Investors Ins. Co. of America,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). We see no reason to alter this determination. *K.H.O.* should not be seen as a vehicle for delaying termination where the record warrants and supports that result.

The application of long-term foster care raised in *K.H.O.* requires a waiting period and substantial time. The children have been in foster care since 1993 and expressed fear over being taken away from the foster parents. There is no reason to delay permanent resolution any longer. L.M.G.'s suggestion of remanding these proceedings pursuant to *K.H.O.* is misplaced—she seeks only to indefinitely postpone permanent placement until such time, if ever, she finally becomes prepared to function as a parent for the children. The children do not have that time available to them. Termination is warranted in this case. We affirm substantially for the reasons set forth in Judge Smith's thorough written opinion of August 15, 1997.

Affirmed.