# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0735-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.T.H.,

     Defendant-Appellant,

and

C.H. and F.L.J.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF

K.Z.T.H.,

     Minor-Appellant,

and

K.E.-L.H. and K.U.J.H.,

Minors-Respondents.

_____

Argued February 27, 2020 – Decided March 26,2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-0004-18.

Patricia A. Nichols, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Patricia A. Nichols, on the briefs).

Amy Melissa Young, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, on the brief).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for minor K.Z.T.H. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Noel Christian Devlin, of counsel and on the brief).

Damen John Thiel, Designated Counsel, argued the cause for minors K.E.-L.H. and K.U.J.H. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Damen John Thiel, on the brief).

PER CURIAM

Defendant A.T.H. (Angie)[1] appeals from the September 27, 2018 judgment of the Family Part terminating her parental rights to her three children, as does one of her children, K.Z.T.H. (Kerry). We affirm.

I.

The following facts are derived from the record and the trial court's findings of fact. Angie is the mother of three children: Kerry, K.E.-L.H. (Kalvin), and K.U.J.H. (Kenny). Kerry's father has not been identified. Kalvin's father, defendant C.H., did not appeal the judgment terminating his parental rights. Kenny's father, defendant F.L.J., surrendered his parental rights to his son.

Plaintiff Division of Child Protection and Permanency (DCPP) first became involved with this family in 2009, three days after Kerry was born, and remained involved for almost a decade, receiving twelve referrals for neglect, mental health issues, inadequate supervision, and substance abuse. While some referrals were not substantiated, during the course of DCPP investigations, Angie admitted marijuana use and that she had been diagnosed with

---

[1] We identify defendant and other parties by initials and pseudonyms to protect confidential information in the record. R. 1:38-3(d)(12).

3                                                                 A-0735-18T2

schizophrenia and bipolar disorder and had not been taking her prescribed medication for five years.  As a result, she was hearing voices.

In addition to Angie's mental health issues, DCPP had concerns about her parenting skills, substance abuse, anger management, and ability to maintain a safe and clean home for her children.  DCPP referred Angie to substance abuse treatment and assistance with parenting skills, anger management, budgeting, housing, employment, and transportation.  At times, Angie was noncompliant with services.  At other times, she completed treatment, but did not maintain long-term compliance.  Angie gave birth to Kalvin during this period.

After a referral alleging Angie hit Kerry with a nebulizer tube, DCPP determined she presented a "substantial risk of physical injury" to Kerry and maintained an environment "injurious to [the] health and welfare" of the child.  DCPP continued to provide drug screens and substance abuse treatment, but Angie was discharged twice for noncompliance and threatening behavior.

DCPP subsequently investigated a referral by Kerry's school that she had a long abrasion on her neck and bruises on her back and forearms.  Kerry alleged Angie beat her with a cleaning instrument.  Angie denied striking the child and, when DCPP personnel found a broken mop in the home, claimed another child may have hit Kerry.  Later, Kerry claimed to have hit herself.  Because of the

inconsistent versions of events, DCPP initiated a safety protection plan with Angie's adoptive mother supervising her care of the children.

Although DCPP continued to provide substance abuse treatment, Angie twice tested positive for illegal substances and was suspended from the program. DCPP referred Angie to an anger management program after she assaulted her girlfriend. She ended services prematurely. Angie did not comply with other services or medication monitoring.

Angie also demonstrated an inability to address concerns arising from Kerry's increasingly worrisome behavior. Angie called DCPP seeking help controlling the child. A DCPP worker who responded to the home found Kerry lying on a bed with her pants down and another child sitting next to her. When told about what the worker discovered, Angie became "hysterical" and said she wanted Kerry removed from the home.

Angie subsequently called DCPP asking for Kerry's removal because the child tried to set fire to the home. On the recommendation of a therapist, DCPP provided individual therapy, family therapy, and a behavioral assistant to Angie and her children. Angie expressed "extremely unrealistic" concerns about her children, and expressed fear of Kerry because the child "knows [Angie] cannot beat her" and because Kerry made unfounded allegations against her.

In light of Angie's non-compliance with services and concerns over her ability to safely parent the children, DCPP filed a complaint seeking care, custody, and supervision of Kerry and Kalvin. With Angie's consent, the children were removed from the home and placed in separate, nonrelative resource homes. The court ordered Angie to comply with parenting skills classes and a psychological evaluation and treatment.

During her first visit with the children, Angie told Kerry that Kerry was the reason the children were in foster care. Angie later told a DCPP worker she "would rather not visit with her daughter and only visit her son." In light of Kerry's escalating behavioral issues during visits, DCPP suspended Angie's visits with the child.

For a period of time, Angie was compliant with services. DCPP worked with Angie on a reunification plan, putting necessary services, including family counseling, in place. Supervised visits with Angie and Kerry resumed, but the child's behavioral issues resurfaced.

Shortly thereafter, Angie gave birth to Kenny. The child was released to Angie's custody because she had been complying with services, and DCPP had no concerns regarding the child's father. DCPP provided in-home services and a home health nurse.

Angie soon began to exhibit behaviors that raised concerns with DCPP. She threw away all of the children's toys. She was verbally abusive to the children, threatened to beat Kerry, and imposed unusual physical punishments on the child. She refused to address those issues with service providers.

Angie began overfeeding Kenny to the point of obesity and engaged in unsafe sleep practices with the child. She resisted assistance, refused to discuss Sudden Infant Death Syndrome, and said her feeding practices were appropriate because she knew how to perform the Heimlich maneuver. A DCPP worker found a Facebook video of Angie force-feeding cake to Kenny while he choked and cried. Other videos suggested Angie was co-sleeping with Kenny. DCPP effectuated an emergency removal of the child.

Angie continued to be non-compliant with services. She made delusional statements and was combative and uncooperative with DCPP workers.

Ultimately, DCPP filed complaints seeking guardianship of all three children. Angie was non-compliant with therapy intended to strengthen her bond with Kerry. Her failure to attend therapy sessions "created unnecessary emotional turmoil" for the child.

Angie was inconsistent with visiting the children. Between 2016 and 2017, she cancelled at least twenty-eight visits. She failed to confirm or missed

at least twenty visits. She was late to at least nineteen visits and asked to end fifteen visits early. When she did visit the children, her behavior was problematic. Angie called Kerry a liar and blamed the children's situation on Kerry's "stupidity." When visits were subsequently suspended, Angie shrugged her shoulders and said, "[w]ell[,] she did it to herself."

After visits were restored, Angie asked that she not be left alone with Kerry. She said she was uncomfortable changing Kalvin's diaper because she was startled by his penis. She attempted to save Kenny's soiled diaper because she had "nothing else from him." During a DCPP inquiry, Angie admitted she saved Kenny's umbilical cord and foreskin, and Kerry's vomit in her freezer as keepsakes.

On September 27, 2018, after a fourteen-day trial, the trial court issued a comprehensive oral opinion. The court found DCPP proved each element of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence and established termination of Angie's parental rights was in the children's best interests. The court based its conclusion on the testimony of both expert and fact witnesses after finding them credible. The court rejected Angie's testimony, finding she "did not demonstrate a clear understanding of her situation or how to resolve it" and "acted in highly concerning fashions during the trial[,]" including

inappropriate reactions to testimony and open hostility. In addition, the court concluded Angie lacked credibility, in part because she feigned illness in court on two occasions in attempts to adjourn the trial.

The court concluded Angie is unable to provide a safe and stable home for her children and that in the almost nine years during which DCPP was providing services to Angie and her family, she "has not stabilized her life in any concrete way[,]" "has shown little awareness of her mental-health issues[,]" did "not consistently take her medication[,]" and remained resistant to mental-health treatment.

On September 27, 2018, the court entered a judgment terminating Angie's parental rights to her three children.

Kerry thereafter moved for visitation with Angie pending appeal. DCPP opposed the motion. Angie's counsel did not respond to the motion and was not invited to do so by the trial court. The court, noting the expert opinion that Angie's inconsistent visitation with Kerry harmed the child, the absence of an expert opinion that Angie and Kerry have a positive relationship, and the just-adjudicated termination of Angie's parental rights, denied the motion.

This appeal followed. Angie argues the trial court: (1) erred when making findings of fact by relying on portions of documents it had previously excluded

from admission into evidence and on the opinions of non-testifying experts embedded in the reports of testifying experts; (2) failed to set forth sufficient findings of fact and conclusions of law in support of its judgment; (3) erred in its analysis of whether the statutory elements of N.J.S.A. 30:4C-15.1(a) had been proven; and (4) applied an incorrect legal standard when it denied Kerry's motion for visitation with Angie pending appeal.

Kerry, who has been placed in a non-adoptive home with caregivers trained to address her behavioral needs, also appealed the September 27, 2018 judgment. She argues the trial court erred when it concluded that termination of Angie's parental rights would not do more harm than good because Kerry has a beneficial relationship with Angie and there is no evidence that her adoption is forthcoming.

II.

We begin with Angie's evidentiary arguments. "In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008) (citing Brenman v. Demello, 191 N.J. 18, 31 (2007)). The general rule as to admission or exclusion of evidence is that "[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed

only if it constitutes an abuse of discretion." State v. Feaster, 156 N.J. 1, 82 (1998); see also State v. J.A.C., 210 N.J. 281, 295 (2012). Under this standard, an appellate court should not substitute its own judgment for that of the trial court, unless "the trial court's ruling 'was so wide of the mark that a manifest denial of justice resulted.'" State v. Marrero, 148 N.J. 469, 484 (1997) (quoting State v. Kelly, 97 N.J. 178, 216 (1984)).

DCPP offered into evidence screening summaries and investigation reports regarding Angie that contained information with respect to prior referrals to the agency. Those documents contained a hearsay statement, noted in several places, from a daycare provider that Angie brought Kerry to daycare dirty and without food. The allegation against Angie was not established, as noted in the relevant documents. The trial court barred admission of the hearsay statement. However, only one reference to the statement in the documents was redacted. The court stated it would not consider other references to the allegation in the documents.

Angie argues that despite the trial court's evidentiary decision, Kalvin and Kenny's law guardian referred to the hearsay statement, which was also alleged in DCPP's complaint, in closing argument. In addition, the trial court referred to the hearsay statement in its opinion and cited an incorrect exhibit number

11

when it did so. Having carefully reviewed the record, we see no error clearly capable of producing an unjust result arising from the trial court's reference to the hearsay statement in its opinion. The trial court was aware that the allegation in the hearsay statement was not established. In addition, the court's reference to the statement was not determinative of its legal conclusions, given the significant amount of evidence in the record supporting termination of Angie's parental rights. The error in the trial court's identification of the relevant exhibit number was immaterial to its analysis and is not a basis to reverse its judgment.

We have reviewed Angie's other arguments relating to the trial court's evidentiary rulings and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

With respect to the trial court's judgment terminating Angie's parental rights, our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related

to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires DCPP to prove:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

After carefully reviewing Angie's arguments in light of the record and applicable legal principles, we are convinced there is clear and convincing evidence supporting the trial judge's findings of fact and her legal conclusion that the four prongs of the statute were satisfied and that it was in the children's best interests to terminate Angie's parental rights. While Angie loves her children, she is not capable of safely caring for them now or in the foreseeable future. The children's only hope for a permanent placement home lies in termination of Angie's parental rights.

We do not agree with Angie's argument the trial court erred when it denied Kerry's motion for visitation pending appeal.[2]  Angie argues the trial court should have analyzed the motion under Crowe v. DeGioia, 90 N.J. 126 (1982), and Rule 4:52, as an application for temporary relief.  She also argues she was denied due process because her attorney did not respond to Kerry's motion and was not invited to do so by the court.

According to N.J.S.A. 30:4C-20,

> [i]f upon the completion of the hearing the court is satisfied that the best interests of the child require that the child be placed under proper guardianship, the court shall make an order terminating parental rights and committing the child to the guardianship and control of [DCPP], and the child shall thereupon become the legal ward of [DCPP], which shall be the legal guardian of the child for all purposes, including the placement of the child for adoption.

Termination of parental rights serves to make the parent a legal stranger to the child.  In re Guardianship of S.C., 246 N.J. Super. 414, 428 (App. Div. 1991).  After termination of Angie's parental rights, DCPP became the guardian of the children.  It is well-settled that "a successful guardianship action under N.J.S.A. 30:4C-15 to -24 necessarily entails a cessation of visitation."  N.J. Div.

---

[2]  We note Kerry did not appeal the trial court's denial of her motion.

of Youth and Family Servs. v. D.C., 118 N.J. 388, 395 (1990).  In the absence of DCPP's consent, there was no basis for visitation pending appeal.

We do not agree with Angie's argument the holding in Crowe should have been applied to Kerry's motion for visitation pending appeal.  Two other precedents upon which Angie relies, In re D.C., 203 N.J. 545 (2010), which concerns post-adoption visitation among siblings, and N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 178-79 (2010), concerning visitation prior to judgment terminating parental rights, are not applicable here.

We are also not persuaded by Kerry's argument that the trial court erred in terminating Angie's parental rights to her.  There is clear and convincing evidence in the record Kerry had an ambivalent and insecure attachment to Angie.  The trial court accepted expert testimony that permanency planning, other than reunification with Angie, is recommended, even though Kerry is not in a pre-adoptive home.  In addition, the court found credible the expert's testimony Angie's mental health and substance abuse issues make reunification in the foreseeable future highly unlikely, in part because she is likely incapable of handling Kerry's behavioral issues.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0735-18T2